UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------------------- X

NELDA AYALA, MOHAMMED ELISSAOUI, EBER VEGA,      :
and CARLOS GARCIA                                                 :

                              Plaintiffs,                          :

       -against-                                                   :

YOUR FAVORITE AUTO REPAIR & DIAGNOSTIC      :
CENTER, INC., AUTO MAINTENANCE SALES &            :
SERVICE CAR WASHING & DETAILING, INC., and       :
ANTHONY BOUMOUSSA, as an individual,                 :

                              Defendants.                        :

--------------------------------------------------------------------------- X

NOT FOR ELECTRONIC
OR PRINT
PUBLICATION

OPINION AND ORDER

14-CV-5269 (ARR) (JO)

ROSS, United States District Judge:

Plaintiffs, Nelda Ayala, Mohammed Elissaoui, Eber Vega, and Carlos Garcia, bring this

action pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-19, and New York

Labor Law ("NYLL"), §§ 190-99 & 650-65, against defendants, Your Favorite Auto Repair &

Diagnostic Center, Inc. ("YFA"), Auto Maintenance Sales & Service Car Washing & Detailing,

Inc. ("AMS"), and the owner of the two corporate entities—Anthony Boumoussa.  Plaintiffs seek

to recover overtime and spread of hours wages allegedly due to them, as well as liquidated

damages, prejudgment interest, and statutory penalties for wage notice and statement violations.

I held a two-day bench trial on September 12 and 13, 2016, to determine whether

plaintiffs are entitled to back wages and other damages pursuant to their claims.  I received

affidavits in advance of trial setting forth the direct testimony of the four plaintiffs, the individual

defendant, and two other employees of defendants; cross-examinations of these individuals was

live.  The four plaintiffs do not speak English as their primary language, and accordingly each

testified with the assistance of a translator.  I also heard testimony from Iulia Iacovlev, a former

employee of defendants.[1]  Finally, I received exhibits into evidence.  On the basis of this

evidence, and the stipulations of fact to which the parties agreed, I now make the following

findings of fact and conclusions of law.  As set forth below, I find that defendants violated

overtime, spread of hours, and wage notice and statement provisions of the FLSA and NYLL.

## FINDINGS OF FACT[2]

Plaintiffs Nelda Ayala, Mohammed Elissaoui, Eber Vega, and Carlos Garcia are former

employees of defendants.  Ayala Test. ¶ 5; Garcia Test. ¶ 5; Vega Test. ¶ 5; Elissaoui Test.

¶¶ 4-5.

**A.    Ayala**

Ayala worked for defendants fom July 17, 2010 to July 7, 2014.  Ayala Test. ¶ 5; Joint

Pre-Trial Order ("JPTO"), Dkt. #54, at 5; Sept. 12 Tr. at 41.  He began working for defendants

for one week as a "trial week," in which he worked for 59 hours[3] and made $400.00.  However,

he testified that defendants withheld the $400.00 from him "as a deposit," and that he never

received this money because Boumoussa later told him one of the cashiers had "stolen [his]

deposit."  Id. ¶¶ 6, 15, 20.

After the trial week, Ayala generally worked the same hours, except on "busy

weekdays"—about two or three times per week—during which he worked until 7:00 P.M.  Id.

---

[1]    In addition, the court received the video and transcript of the deposition of non-party witness Garth Sullivan, taken August 23, 2016.  These materials are on file with the court, and the parties stipulated to their admission into evidence.  See Stipulation, Dkt. #77.

[2]    At trial, and as mentioned, certain witnesses provided their direct testimony in the form of affidavits.  "____ Test. ¶ ____" refers to the paragraph in the affidavit of direct testimony of the designated witness.  "Dep. at" refers to the page of the designated witness's deposition.  "PE" refers to a plaintiffs' trial exhibit and "DE" to a defendants' trial exhibit.  "Sept. ____ Tr." refers to citations to the rough trial transcript.  I have included a parenthetical identifying the individual whose testimony is being cited, unless the same is clear from the context.

[3]    Specifically, he worked from 7:30 A.M. until 6:00 P.M. Monday through Friday, and from 7:30 A.M. until 5:00 P.M. on Saturday.  Id. ¶ 6.  He took a 30-minute lunch break each day.  Id.

¶ 7. He thus worked, on average, a 62-hour workweek. He primarily performed mechanical work for defendants, including "changing timing belts, alternators, struts, bearings, water pumps, engine replacement, radiators, fuel pumps, and sometimes changing tires and doing oil changes." Id. ¶ 8. For approximately 20 months during the time he worked for defendants, he took English classes that caused him to leave work early. Id. For twelve of these months, he left work at 6:00 P.M. two times per week, and for eight of these months, he left work at 5:00 P.M. one day per week and at 6:00 P.M. one day per week. Id. Accordingly, for those 20 months, he worked approximately 60 hours per week.

When he first began working for defendants in 2010, he does not recall keeping track of his time.[4] In 2011, when he believes "YFA first began using their time keeping system," Boumoussa directed Ayala to enter his initials, "NA," into the computer when he arrived at and left work, and when he started and ended his lunch break. Id. ¶ 10.

At some point in 2011, he got a raise and began making $450.00 per week. Two months later, he was told he would be paid $7.65 per hour—$450.00 divided by approximately 60 hours. Id. ¶ 11. He testified that he understood and was paid on an hourly basis at that time. Sept. 12 Tr. at 61-62 (stating that he understood he would be paid on an hourly basis early in 2011). He was paid this sum partially by check and partially by cash. Ayala Test. ¶ 11. He also received approximately $150.00 each week in commissions, as well as "an additional amount in tips from customers." Id. ¶ 12. Later, he began making $10.00 per hour, and appears to have in fact been paid that hourly rate. Id. ¶¶ 14, 17 ("If I worked 62 hours, I would get $620 minus the amount I was paid by check, in cash."); Sept. 12 Tr. at 43 (stating that in the last year of his employment with defendants, he made $10.00 per hour).

---

[4]       The court notes, as will be discussed later, that defendants produced timesheets purporting to record Ayala's hours beginning in August 2010. See DE A-2.

Ayala testified that "it was the regular practice at YFA to deduct . . . money from the employees' pay." Id. ¶ 16. Specifically, on one occasion, after Ayala damaged a customer's transmission, defendants required him to pay $850.00 to repair the damage. Id. ¶ 14. Boumoussa gave him a raise to $10.00 per hour to "help [him] pay for damage," and after that point $100.00 per week was deducted from his pay until the damage to the car was fully paid. Id.; Sept. 12 Tr. at 55, 57 (Ayala Test.). After Ayala fully paid off the damage, a secretary, Zineb Baghdadi, signed the bill—dated September 3, 2013—and wrote "Neldo paid full" on the front of it. Ayala Test. ¶ 14; see also PE 8-1, 8-2.

He testified that he never received a statement indicating how much he was paid per hour, or any document explaining how his weekly pay was computed. Id. ¶ 18.

## B.   Garcia

Garcia testified that he worked at YFA between March 2010 and August 2013.[5]  Garcia Test. ¶¶ 5, 11. During his first year of employment—between March 2010 and March 2011—he cleaned and swept the auto shop. Id. ¶¶ 6, 8. He worked approximately 56 hours each week.[6] He earned $400.00 his first week, but defendants withheld that money as a "deposit," and never paid it back to him. Id. He earned $400.00 each week regardless of how many hours he worked. Sept. 12 Tr. at 32-33. In his second year of employment, he began to take on additional job

---

[5]      Where a plaintiff's testimony "established the month, but not the specific date . . . [of their employment with defendants], the Court awards damages beginning on the 15th day of the month they began their employment." Hernandez v. Jrpac Inc., No. 14-CV-4176, 2016 WL 3248493, at *33 (S.D.N.Y. June 9, 2016). I apply the same method regarding the date on which a plaintiff ended his employment.  Accordingly, I find that Garcia worked for defendants between March 15, 2010 and August 15, 2013.

[6]      This determination is based on Garica's testimony that he worked from 7:30 A.M. until 6:00 P.M. four days per week during the workweek, with a half hour lunch break. Id. ¶ 6.  He also worked Saturdays from 8:00 A.M. until 5:00 P.M., and Sundays from 8:00 A.M. until 4:00 P.M., again with a half hour lunch break each day. Id.

responsibilities—performing oil changes and mechanic's work.[7]  Id. ¶ 8.  Beginning in

approximately March 2011 he began making $450.00 per week, and he began earning

commissions of approximately $100.00 per week, as well as tips from customers.  Garcia Test. ¶

8.[8]  Beginning in approximately March 2012, he received another raise to $500.00 per week,

which is what he earned until he stopped working for defendants.  Id. ¶ 10.

At all times, defendants paid him in cash.  Id. ¶ 7.  He logged his hours in a computer

system by using his initials, "CA," whenever he arrived at work, left and returned for lunch, and

left work for the day.  Id. ¶ 9.  He testified that "[i]f any vehicle [he] was working on was

damaged, [he] had to pay for it."  Id. ¶ 12.  Specifically, he recalled two instances where

Boumoussa demanded money for damaged automobile parts: in the first, defendants required

Garcia to pay $200.00 for a customer's broken brake light (through a deduction from his pay for

the week), and in the second, defendants required Garcia to pay $80.00 in connection with his

work changing rear brakes.  Id.  Finally, he testified that he was never given a statement showing

---

[7]  At trial, defense counsel argued that Garcia lied about receiving commissions in order to raise his regular rate of pay for FLSA purposes, but that in fact, Garcia only cleaned the auto shop.  Sept. 13 Tr. at 91.  Defense counsel entered into evidence an affidavit by Garcia submitted in connection with plaintiffs' earlier application for default judgment in this case, in which Garcia stated that he "was assigned various duties" while employed by defendants, including "but not limited to" certain cleaning tasks, and did not mention doing any mechanic work for which he would earn commissions.  See DE I; Dkt. #10-11.  Defense counsel also relies on the fact that Garcia did not produce any commission reports.  Sept. 12 Tr. at 31; Sept. 13 Tr. at 91.  But, as further discussed below, I credit Garcia's testimony.  Each of the plaintiffs were unable to provide full records of the commission reports that they received from defendants—a fact that is not unreasonable, given that the commission reports are several years old.  And, as further set forth below, defendants have failed to produce any commission reports themselves—or any reliable time records—that might counter plaintiffs' testimony.  Moreover, Elissaoui confirmed that Garcia began working as a cleaner—"[b]ecause when he started, he was young, really young"—but that Garcia gradually took on more responsibilities.  Sept. 13 Tr. at 12.  I thus credit Garcia's testimony about his job responsibilities and, perhaps more importantly for this case, about the commissions that he earned.

[8]  During this time, he would sometimes work until 7:00 P.M. on busy weekdays, but he only did so around three times per month.  Id. ¶ 8.  No other change in his hours occurred until he stopped working for defendants.  Id. ¶ 11.  Although he testified that he took English classes while employed by defendants, he would simply arrive to class late if he had to work late on a particular evening.  Id. ¶ 14.

his hourly rate of pay, or any statement that explained how his weekly pay was computed. Id. ¶ 16.

## C.   Vega

Vega worked for defendants between April 8, 2012 and May 15, 2014. Vega Test. ¶ 5; Sept. 12 Tr. at 86.   When he was hired, he was told he would work 60-hour work weeks and would be paid $600 per week.[9] Vega Test. ¶ 6.   In general, Vega in fact worked these hours during weekdays, but "[i]f it was busy during the week, [he] would work until 7PM, and this generally happened twice a week." Id.   During weekends, he would only work until 5:00 P.M. on Saturdays and 4:00 P.M. on Sundays. Id.   He took a 30-minute lunch break most days. Id. ¶ 10.   Accordingly, I find that Vega worked approximately 56 hours each week.   There was one six-month period in which he took English language classes, and during that period of time, he left work at 5:00 P.M. "every weekday" and started work at 7:30 A.M. rather than 8:00 A.M. Id. ¶ 6.   Accordingly, during six of his months working for defendants, he worked approximately 52 hours per week.   Finally, while working for defendants, there were three weeks in which he did not report to work. Id.

He was paid $600 per week for the first six months that he worked for defendants, during which time he was paid in cash. Id. ¶¶ 7-8.   In October 2012, Boumoussa told Vega he would be paid on an hourly basis, at $10.00 per hour for a 60-hour work week. Id. ¶ 8; Sept. 12 Tr. at 85. From that point on, he would be paid "partially by check and partially in cash, which added up to $600." Vega Test. ¶ 8.   If the time sheets showed "over 60 hours, [he] would be paid an additional $10 per hour for the hours over 60." Id.   In addition to this hourly wage, he made

---

[9]      Specifically, he was told that he would work six days per week from 8:00 A.M. until 6:00 P.M.

money each week in tips, and approximately $120.00 to $180.00 per week in commissions. Id.
Beginning in April 2013, he began making $11.00 per hour. Id.

He also logged his hours in a computer system using his initials, "EV," when he arrived
and left for the day and when he went to and came back from lunch. Id. ¶ 10. Each week, he
was given a timesheet, signed the timesheet, and returned the timesheet to a secretary; he was not
given a copy to keep for himself. Id. ¶ 11. He testified that on one occasion, Boumoussa took
$280.00 out of his wages to pay for damage that Vega had caused by failing to properly tighten a
bolt on a tire. Id. ¶ 12. He also did not receive his $600.00 pay for the first week of his
employment. Id. ¶ 7. He never received an annual wage notice telling him his rate of pay, and
he never received any written notice informing him about his wages. Id. ¶¶ 15-16.

**D.    Elissaoui**

Elissaoui worked for defendants from the 2008 summer[10] until November 27, 2013, with
the exception of the two-month period between August 3, 2011 and October 13, 2011, as well as
the last week of Ramadan each year. Elissauoi Test. ¶¶ 6, 8; Sept. 13 Tr. at 7-8. He worked six
days for $450.00 per week. He worked approximately 59 hours each week.[11] He performed a
variety of mechanical work for defendants, including "tune-ups, changing axles, shocks, struts,
intake manifolds, fan belts, brake shoes and calipers, spark plugs and distributors, and changing
tires, oil and transmission fluid, as well as doing state inspections." Id. ¶ 10.

---

[10]    Elissaoui was unable to recall the specific date on which he began working for defendants. The state stat-
ute of limitations cut-off, based on the filing of this action on September 9, 2014, was September 9, 2008. I credit
Elissaoui's testimony and accordingly use the September cut-off date for purposes of determining the precise date
on which he began working for defendants.

[11]    Specifically, he worked from 7:30 A.M. until 6:00 P.M. for four weekdays, from 8:00 A.M. until 5:00 P.M.
on Saturdays, and from 8:00 A.M. until 4:00 P.M. on Sundays. Id. ¶ 7. When it was busy—about two to three times
per week—he would work until 7:00 P.M. Id. He took 30 minutes for lunch each day. Id.

At some point during his five years of employment with defendants, his supervisor, Ahmed Elmoutauakil, "told [him] that inspectors had come in looking into how much the employees were being paid," so he would be paid on an hourly basis, at $8.00 per hour. Id. ¶ 12. Despite this purported change, he continued to receive $450.00 per week, which he was paid partially by check and partially in cash. Id. ¶¶ 12-13; see also Sept. 13 Tr. at 28-29 (Elissaoui Test.). He also earned money through commissions each week, which he was paid in cash. Elissoui Test. ¶¶ 17-18. Finally, he sometimes earned tips. Sept. 13 Tr. at 8-9.

Although he was shown each week the dollar amount he was paid and the hours that he worked—and at times he signed off on these figures—they "showed less hours than [he] had actually worked," and he was ordinarily not allowed to keep the statement. Elissaoui Test. ¶¶ 13-15. There was one exception, where Elissaoui kept a timesheet report for the week of June 10, 2013, which showed that he worked 53.9 hours that week. Id. ¶ 15; Pls.' Ex. 1-1. This timesheet has handwriting on it, which reflects Elissaoui's attempt to calculate what he should have earned that week if he made $8.00 per hour and $9.00 per hour, respectively. Id.

He testified that his pay for his first week of employment—$375.00—was withheld. Id. ¶ 11. Unlike the other plaintiffs' first-week pay, this money was actually returned to Elissaoui upon his request after he stopped working for defendants. Id. ¶ 24. On three other occasions, defendants withheld money from his pay for damages incurred to customers' cars. In the first, a customer's engine seized after Elissaoui had repaired the car, and he and Elmouatakil each paid $1000.00 in repairs. Id. ¶ 20. In the second, after denting a customer's car, defendants required Elissaoui to pay $150.00 in repairs ($50.00 was taken out of his pay for a 3-week period). Id. ¶ 21. In the third, after a customer complained about wheel covers that had not been replaced, defendants required Elissaoui to pay $30 out of his pay. Id.

He logged his hours on a computer system using his initials when he arrived and left for the day, and when he went to and came back from lunch. Id. ¶ 9. At first, he used the initials "ME." Id. At some point, however, he "was having trouble entering the data for [his] commission reports." Id. ¶ 18. Boumoussa changed his initials to "MI" in the system. Id. He continued to have a problem, so Boumoussa changed his initials to "MEIR" (for Mohammed El Issaoui and his son's name, Rayan). Id.

Finally, Elissaoui testified that he was never given a statement indicating how much he would be paid per hour, or any document that explained how his wages were computed. Id. ¶ 25

## E.     Defendants' Documentary Evidence

As discussed at length below, I find that during the relevant period, defendants failed to make, keep, and preserve accurate records of the hours plaintiffs worked. This finding is based upon my analysis of the purported wage and hour records defendants have produced, spoliation of the evidence caused by defendants, and plaintiffs' credible testimony (and defendants' incredible testimony) regarding the hours each plaintiff worked and the manner in which those hours were recorded.

Defendants produced three primary types of records containing information about plaintiffs' hours worked and wages earned. First, defendants produced photocopies of checks mailed to each of the four plaintiffs. These checks are signed by "Tony Boumoussa," and state that they are for "salary." See, e.g., DE A-1. Both parties marked these checks as trial exhibits, and the parties do not appear to dispute the validity of the checks. See PE 9-11, DE A-1-A-1064.[12] Indeed, each of the plaintiffs—excepting Garcia[13]—testified that they were paid

---

[12]     Documents setting forth the checks received by plaintiffs, a summary of hours worked by each plaintiff, and payroll history reports produced by defendants are interspersed throughout this 1,064 page range.

[13]     As to Garcia, both parties agree that he was paid wholly in cash. Garcia Test. ¶ 7; Boumoussa Test. ¶ 15.

partially in cash and partially by check. Ayala Test. ¶ 11; Vega Test. ¶ 8; Elissaoui Test. ¶¶ 12-13; see also Boumoussa Test. ¶ 11. I find that defendants in fact paid the amount depicted in these checks.

Second, defendants produced "payroll history reports" that purport to set forth the calculations by which the check amounts were generated. DE A-1-A-1064. Defendants paid plaintiffs their checks on a weekly basis. Id. The payroll history reports appear to have been generated on a monthly basis, and thus each report includes calculations for several weeks. Id. Each weekly calculation sets forth information purporting to show the regular hours worked, overtime hours worked, regular and overtime wage rate per hour, regular and overtime wages earned, tips earned, and any applicable taxes or deductions (such as for social security). Id. The amount that each plaintiff would be paid by check appears to have been calculated as follows: wages earned less tips already retained by the employee less taxes/deductions.

Defendant supports the numbers listed in each payroll history report by its third and fourth categories of documents: documents purporting to show the hours worked by each plaintiff on a weekly basis, and documents purporting to show tips earned by each plaintiff on a weekly basis. DE A-1-A-1064; B-1-B-407. The hourly timesheet reports produced by defendants list the weekday, calendar date, start time, end time, a summation of hours worked for each day, and "paid hours total"—a summation of the hours worked each week. See, e.g., DE A-884. The tip sheets that defendants produced are form documents created by the Internal Revenue Service ("IRS"). DE B-1-B-407. These IRS forms—specifically, Forms 4070A—are entitled "Employee's Daily Record of Tips." Id. There are boxes filled out with each plaintiff's name and the employer's name (Auto Maintenance). Id. In the "Tips received directly from

customers and other employees" box, each tip record lists the week that the recorded tip purported to cover, e.g., "the week of 06-10-13 to 06-16-13." See, e.g., DE B-391. In the "Tips paid out to other employees" box, the purported amount of tips paid to the respective plaintiff is listed. Id. And finally, the name of the respective plaintiff is listed on the box labeled "Names of employees to whom you paid tips." Id.

> Boumoussa testified that these records were created as follows:

> I would transmit the hours worked as reported by the time keeping system on the office computer I had at the plaza to my accountant who would then send me back the calculations for the checks. I would then write out the checks and distribute them to the employees. An example of the Employee Timesheet Report that I would send to my accountant would be [DE A-402]. An example of the check that would be issued to the employee can be seen at [DE A-401]. The computer system also generated a weekly Payroll History Report; an example of this document is [DE A-403].

Boumoussa Test. ¶ 10.

The other documentary evidence in this case severely undercuts the reliability of defendants' documents. First, plaintiff Elissaoui produced an employee timesheet report for the week of June 10, 2013-June 16, 2013. PE 1. The time sheet indicates that it was printed on June 19, 2013 at 5:51 P.M. Id. It shows that Elissaoui worked 53.9 hours that week. The timesheet for the same week—but produced by defendants—shows that Elissaoui worked only 39.11 hours that week. PE 2; DE A-884. The payroll history report for that week calculated the amount that Elissaoui was owed by check based upon a workweek of 39.11 hours. DE A-878. It stated that Elissaoui's rate of pay for those hours was $5.86 per hour, amounting to a total of $229.18. Id. It stated that Elissaoui received $80.00 in tips that week—a sum that one of the tip sheets defendants produced also lists—and it provided that $56.27 was taken out of Elissaoui's wages in taxes. Id.; DE B-391. Accordingly, the payroll history report for that week calculated that

Elissaoui was owed $172.91 ($229.18 + $80.00 - $80.00 - $56.27). Id. A check dated June 18, 2013, signed by Boumoussa and made out to Elissaoui for "salary" is in the amount of $172.91.

However, the validity of that check amount—and the validity of the amounts calculated in the payroll history report—fall away if the timesheet report produced by Elissaoui, and not defendants, is the true reflector of the hours that Elissaoui worked that week. In other words, the amounts calculated in the payroll history report depend upon the first input in that report—the amount of hours worked. And despite the almost 15-hour difference in plaintiffs' and defendants' records regarding Elissaoui's recorded hours for that week, the two documents bear striking similarities, which this court has bolded in the below chart.

| DAY | DATE | DEFENDANTS' RECORDED START TIME | DEFENDANTS' RECORDED END TIME | DEFENDANTS' TOTAL HOURS | PLAINTIFFS' RECORDED START TIME | PLAINTIFFS' RECORDED END TIME | PLAINTIFFS' TOTAL HOURS |
|---|---|---|---|---|---|---|---|
| Mon. | 6/10 | **07:46** | 14:02 | 6.26 | **7:46** | 14:01 | 6.25 |
| | | **14:33** | **18:05** | **3.53** | **14:33** | **18:05** | **3.53** |
| Wed. | 6/12 | **08:12** | **13:13** | **5.01** | **8:12** | **13:13** | **5.01** |
| | | | | | 14:05 | 18:09 | 4.06 |
| Thurs. | 6/13 | **08:11** | 15:13 | 7.03 | **8:11** | 18:13 | 10.03 |
| Fri. | 6/14 | | | | 8:12 | 13:19 | 5.11 |
| | | **14:15** | **18:46** | **4.51** | **14:15** | **18:46** | **4.51** |
| Sat. | 6/15 | **08:08** | **14:57** | **6.81** | **8:08** | **14:57** | **6.81** |
| | | | | | 15:26 | 16:46 | 1.33 |
| | | | | | 16:47 | 16:49 | 0.03 |
| Sun. | 6/16 | 08:02 | 14:00 | 5.96 | 8:18 | 13:40 | 5.36 |
| | | | | | 14:35 | 15:57 | 1.86 |
| | | | | | 15:58 | 15:59 | 1.01 |

*Defendants' and Plaintiffs' Reported Hours for Elissaoui for the Week of June 10, 2013 to June 16, 2013*

The remarkable similarities between the numbers set forth in Elissaoui's timesheet as produced by defendants, and the same as submitted by plaintiffs, strongly suggests to this court that hours

were simply deleted (by defendants) or added (by plaintiffs). All of the circumstantial evidence presented in this case, as I will describe below, suggests the former.

**F.    Credibility Determinations**

First, I credit the testimony given by plaintiffs in this case. As stated by another court in this circuit,

> Credibility determinations can be of great importance in cases where, as here, there are conflicting accounts as to workplace practices and the authenticity of documents. In this case, credibility determinations were complicated by language barriers. All plaintiffs testified in [a non-English language] and their testimony was conveyed to the Court by a translator. Thus, the Court, as factfinder, lacked direct access to some of the linguistic cues or nuances of expression that can bear on a witness's veracity . . . .
>
> Despite these limitations, some important observations relating to credibility could be made, and the Court was generally able to assess the credibility of the witnesses' claims in their sworn declarations based on the extent to which that testimony withstood cross examination and accorded with other credible evidence.

Hernandez, 2016 WL 3248493, at *19. All of these circumstances are applicable in this case, and are augmented by the fact that the instant plaintiffs were not even native speakers in the same language; Ayala, Garcia, and Vega speak Spanish, but Elissaoui's first language is Arabic, and he testified that he "speak[s], understand[s], and read[s] very limited English." Elissaoui Test. ¶¶ 2-3; see also Ayala Test. ¶¶ 2-3; Garcia Test. ¶¶ 2-3; Vega Test. ¶¶ 2-3. The fact that Elissaoui's testimony regarding defendants' wage and hour practices is similar to that given by the other plaintiffs adds to the credibility of plaintiffs' testimony as a whole.

Nonetheless, plaintiffs' testimony was not a cookie-cutter recitation of the same facts; there were some discrepancies. The largest of these regarded whether a cashier or some other employee of defendants showed plaintiffs accurate timesheets each week. Garcia testified that he was never given timesheets—nor did he request to see one or dispute his hours with Boumoussa or a secretary. Sept. 12 Tr. at 39. Ayala testified that each week, he was shown and

signed a timesheet indicating the number of hours that he worked, and that these hours reflected the number of hours that he actually worked. Id. at 42, 46. Vega also testified that each week, he was shown a timesheet for him to sign. Id. at 79-80. He testified that sometimes—although infrequently—these timesheets would be missing a few hours. Id. at 80, 88. Elissaoui also testified that each week, he signed a timesheet. Sept. 13 Tr. at 14. He testified that sometimes these hours were incorrect and that he complained regularly to the secretary and his manager that his hours were incorrect. Id. at 13, 15. The lack of uniformity on this point does not trouble this court nor cast doubt on plaintiffs' testimony. I do not find that this point is material, and indeed it seems plausible that the plaintiffs had variations in their experiences working for defendants.[14] What is clear from plaintiffs' testimony, and the documents in evidence, is that the hours on the timesheets produced by defendants were not the hours plaintiffs actually worked.

Defendants sought to discredit plaintiffs' testimony through witnesses they presented at trial. Iulia Iacovlev, a former cashier in the auto shop, testified that her job duties as a cashier were to cash out customers and enter inventory into the system—and that she did not deal with payroll. Sept. 12 Tr. at 94. I credit Iacovlev's testimony. Nonetheless, I find that it has limited bearing on the dispute in this case; it is apparent to this court that Boumoussa delegated certain duties to certain individuals in his employ. It is thus entirely possible, even likely, that Iacovlev performed certain job duties as a cashier, and that another cashier dealt with hours and timesheets. And although Iacovlev testified that another employee, Baghdadi, did not distribute pay to the mechanics, such testimony was necessarily limited by her own observation and

---

[14]     For example, I note that from a purely practical perspective, it makes sense that Elissaoui had more interaction with his manager and with Baghdadi, the secretary. All three were Moroccan, and all spoke the same language. Sept. 13 Tr. at 72 (Baghdadi Test.).

knowledge. Id. at 98. Indeed, Iacovlev testified that she would not look inside the garage where the technicians worked, but instead remained in her office. Id. at 100-01.

Defendants also called Ahmed Elmoutauakil and Zineb Baghdadi to testify. Both witnesses are current employees of Boumoussa's. Elmoutauakil has worked for Boumoussa for thirteen years, Baghdadi for six. Sept. 13 Tr. at 33 (Elmoutauakil Test.); 81 (Baghdadi Test.). I did not find the relevant portions of their testimony to be credible. For example, Baghdadi testified that when she first started working for defendants, she was a salesperson in the used car area, that she did not work in the auto shop, and that in the entirety of the six-year period that she worked for defendants her job responsibilities did not evolve in any way.[15] Sept. 13 Tr. at 81-82. But she also testified that she knew the plaintiffs in this case, and described them as her "co-workers." Id. at 71. And although Baghdadi testified that she did not handle paperwork regarding plaintiffs' hours or pay, plaintiffs provided documentary evidence directly supporting their claim that she did in fact perform such tasks. Specifically, Ayala produced an invoice for work that had to be paid after a car had been damaged in defendants' auto shop. Ayala Test. ¶ 14. Ayala paid $100.00 per week—deducted from his paychecks—until that damage was paid in full. Id. When the damage had been paid off, Baghdadi signed the bill so indicating. Id. The invoice for this work was submitted into evidence, and written on the invoice is: "Paid Full by Neldo 09/23/2013 Zineb." PE 8-2.

Elmouatakil, for his part, was the plaintiffs' direct manager, but was wholly unable to meaningfully testify regarding plaintiffs' hours or pay. Sept. 13 Tr. at 34. For example, although he insisted he did not know plaintiffs' hours, he was able to remember that they left early "pretty much every day," around 4 P.M. Sept. 13 Tr. at 41-43. And he testified that "they

---

[15] Baghdadi did testify that after the alleged theft of the computer server, which I address later in this opinion, she helped at a cashier station in the auto shop "because they wanted to do things manually." Sept. 13 Tr. at 82.

always went home earlier than 6:00." Id. at 44. But that testimony is contradicted by defendants' own records, many of which show plaintiffs working after 4:00 P.M., after 5:00 P.M., and even after 6:00 P.M. Id. at 51-52; see generally DE A-1-A-1064. He also testified that the auto shop closed at 6:00 P.M. every day and that no work was performed on cars after that time. Id. at 44. But he later conceded that it was possible that plaintiffs could work later than 6:00 P.M., such as when a job was not finished. Id. at 55. His testimony was rife with inconsistencies, and I do not find it to be reliable or credible.

Finally, I do not credit the testimony of defendant Boumoussa. As with the other defense witnesses, his testimony was filled with discrepancies. For example, he testified that his accountant kept records of pay stubs allegedly given to plaintiffs. Sept. 12 Tr. at 120. But defendants did not offer these exhibits into evidence. He also testified that after the alleged break-in at his company, he filed insurance claims and produced those claims. Id. at 178. But his counsel stipulated that those documents were never entered into evidence. Id. Boumoussa also testified on cross-examination that, to complete the IRS tip records entered into evidence in this case, he would write notes recording tips the plaintiffs received on a "blank piece of paper that [he] added up at the end of the week and forwarded" to his accountant. Id. at 125. He testified that customers would sometimes hand tips to secretaries but that "[m]ost of the time [he was] always on the plaza. And if the customer wants to give the technician a tip, [he] would take the tips and make a notation[] of that." Id. at 130. But in his direct testimony affidavit, he swore that "the employees received tips from customers which I did not handle and which they kept for themselves." Boumoussa Test. ¶ 21 (emphasis added). In sum, examples such as these litter Boumoussa's testimony, which I find to be incredible.

16

Finally, and as set forth in further detail below, I entirely discredit the testimony of these three witnesses as such testimony pertains to the alleged September 2015 break-in of defendants' business.

## G.   Plaintiffs' Testimony and Documentary Evidence

Turning, then, to the testimony given by plaintiffs regarding their payment and hours worked in this case, each plaintiff testified that he clocked into a computer system when he arrived in the morning, clocked out for lunch, clocked back in when he returned from lunch, and clocked out again at the end of the day. See Ayala Test ¶ 10; Garcia Test. ¶ 9; Vega Test. ¶ 10; Elissaoui Test. ¶ 9. The timesheet produced by Elissaoui reflects this practice.[16]  PE 1. In fact, the only day in which Elissaoui did not clock out around lunchtime, and later clock back in, was Thursday, June 13, 2013. Id. The timesheet produced by defendants show Elissaoui only clocking out one day—on Monday—for lunch. PE 2; DE A-884.

Indeed, this court's review of all of the timesheets produced by defendants reveals an astonishingly low number of instances in which there are double entries for a single day that would signify that a plaintiff clocked in and out for lunch. See generally DE A-1-A-1064. If there had been no instances of such double entries in defendants' records, this court might be inclined to surmise that the timesheet reports simply did not take into account such clocking in and out. But there are some—though few in the context of the hundreds of these reports produced by defendants—that reflect these double entries. When a timesheet does contain

---

[16]     This timesheet has handwriting on it. PE 1. Elissaoui testified that this handwriting "was [his] attempt to calculate what [he] would earn making $8 per hour for 56 hours, which was $448, and then what [he] would earn making $9 per hour, which was $504." Id. The presence of this handwriting, and Elissaoui's explanation of it, also lends weight to the authenticity of the document produced by plaintiffs, rather than the same produced by defendants.

double entries, the hours worked per week hover remarkably close to 40 hours. See, e.g., DE A-505 (40.17 hours); DE A-516 (39.69 hours).

The general lack of presence of entries in defendants' timesheets signifying that plaintiffs clocked in and out for lunch suggests that defendants simply deleted before-lunch and after-lunch hours from plaintiffs' timesheets in order to produce timesheets that reflect, on average, 40-hour workweeks. For example, in DE A-503, Vega appears to have clocked out every day around lunchtime, but never clocked back in. Similar instances appear across all of defendants' purported timesheets.[17] Moreover, other documents—in addition to the timesheet Elissaoui produced for the week of June 10—support plaintiffs' testimony that they clocked in and out for lunch on a regular basis (thus refuting defendants' documents that show an absence of the same practice). For example, Ayala produced a timesheet reflecting his hours on his last day of employment with defendants, July 7, 2014. PE 3. That timesheet shows that Ayala clocked in at 7:07, clocked out at 13:11, clocked back in at 13:33, and clocked out at 18:03, for a total 10.56-hour workday, and what appears to be a 20-minute lunch break. Id.

As another example, Vega testified that he took a screenshot of his hours one day, and produced that screenshot to defendants. Vega Test. ¶ 11; PE 4. That screenshot shows that Vega clocked in every morning, clocked out and back in every day for lunch, and clocked out when he

---

[17]  There was testimony from one individual—Elmouatakil—that could rebut the assumption that defendants simply deleted hours before or after the lunch break. Elmouatakil testified that "half the guys come from 12:00, the lunch, the shift change the shift, you know." Sept. 13 Tr. at 43. But he then testified that he did not know when his employees would come to work, but he "know[s] . . . some of them come late." Id. He also testified that only Boumoussa kept track of the employees' hours. Id. at 44. He later testified that plaintiffs would come in at 11:00 A.M. and leave at 4:00 P.M. Id. at 66. And plaintiffs' counsel successfully impeached him with his deposition testimony, in which he provided yet another time frame for plaintiffs' hours—from 8:00 A.M. until 5:00 P.M. Id. at 66-67. As set forth above, Elmouatakil did not give reliable, credible evidence on this, or any, point.

Boumoussa, for his part, testified at trial that "[t]he understanding [wa]s that [plaintiffs] would come in at 8:00 unless we discussed prior . . . if they are coming in later, or they are not coming in." Sept. 12 Tr. at 137; see also id. at 138 ("Q. Okay. So if [the] weather was good, every[one] was supposed to be there at 8:00; is that right? A. Yes.").

left for the day. PE 4. This exhibit, again, directly supports plaintiffs' testimony that they regularly clocked in and out for lunch. The sparsity of records reflecting the same practice in defendants' timesheets raises serious doubts in this court's mind as to the validity of those timesheets.

Plaintiffs' records provide additional—and more direct—evidence refuting the accuracy of defendants' records. For example, the screenshot that Vega produced shows that he worked 53.68 hours that week. PE 4. Although the screenshot does not contain a date, and the court cannot thus cross-reference it to any of defendants' documents, it is notable that no document produced by defendants depict Vega working more than 43 hours in a single week. In addition, Garcia testified that on August 17, 2013, a Saturday, Elissaoui and Garcia were "at work at YFA." Garcia Test. ¶ 15. A co-worker snapped a photo of the pair on Garcia's phone at 3:42 P.M. that day. Garcia testified that when the photo was taken, the pair "were only a few feet from the YFA shop, and the store shown in the background of the photograph is a CVS which is right near the shop." Id. He testified that they were "wearing [their] uniforms in the photograph," and that he would "change back into . . . regular clothes at the end of the day." Id. Elissaoui testified to the same. Elissaoui Test. ¶ 16. This photograph directly contradicts defendants' timesheet records of the same day, which show Elissaoui clocking in at 7:58 A.M. and clocking out at 2:00 P.M. (for a total of 38.75 hours that workweek). DE A-893. Defendants' records for Garcia end at the week of April 29, 2013, although the parties stipulated that Garcia worked at AMS until August 31, 2013.[18] JPTO at 5.

---

[18]     I am wholly unconvinced by defendants' efforts at trial to paint the production of this photograph as suspect because plaintiffs took other photos of themselves at work, but did not produce other photos. See, e.g., Sept. 12 Tr. at 32 (Garcia Test.); Sept. 13 Tr. at 20-21 (Elissaoui Test.). The fact of other photos is irrelevant. The photograph that was produced depicts Garcia and Elissaoui at work at a time when defendants' records do not place them there. It is credible, relevant evidence.

Next, each plaintiff testified that he clocked in on the computer system by using his initials. See Ayala Test. ¶ 10; Garcia Test. ¶ 9; Vega Test. ¶ 10; Elissaoui Test. ¶ 9. On the timesheet reports produced by plaintiffs, each employee name is listed alongside that employee's initials. See PE 1 (listing the employee as "MEIR Mohamed El Issaoui"); PE 3 (listing the employee as "NL Neldo Ayala Lopez"). In contrast, all of defendants' time records list only the employee's name, unaccompanied by any initials. See, e.g., DE A-884. Elissaoui testified that when he first started using the time entry system, he used the initials "ME." Id. At some point, however, he "was having trouble entering the data for [his] commission reports." Id. ¶ 18. Boumoussa changed his initials to "MI" in the system. Id. He continued to have a problem, so Boumoussa changed his initials to "MEIR" (for Mohammed El Issaoui and his son's name, Rayan). Id.

Elissaoui's testimony is directly supported by the commission reports—documents showing the commissions that each plaintiff earned for various car-related sales that he made— that plaintiffs produced in this case.[19] The commission reports produced by Elissaoui dated 2010 and 2011 list his name as "ME Mohamed El Issauoi." See, e.g., PE 5-52; 5-1. Those from 2012 list his name as "MI Mohamed El Issaoui." See, e.g. PE 5-79. And those from 2013 list his name as "MEIR Mohamed El Issaoui." PE 14-1. The plaintiffs' testimony—directly supported by the commission reports that plaintiffs produced—supports the authenticity of the timesheet

---

[19]     At trial, defense counsel sought to question the reliability of these reports. See, e.g., Sept. 12 Tr. at 18 (Defense Opening Statement). Defendants argued that the commission reports produced by plaintiffs are fake because they listed each entry for which plaintiffs made a commission twice in an alleged effort to increase their regular rate of pay and, the theory goes, create the illusion that they were working more than they actually were. Sept. 13 Tr. at 92 (Defense Summation). But Ayala readily admitted in his testimony that the doubling of these entries did not represent two jobs; instead, they represented one job, and such tabulation was "just a way to show how much commissions [he was] going to get for that job." Sept. 12 Tr. at 50. Moreover, defendants did not enter into evidence any other version of its own commission reports. Id. at 18-19 ("[A]t the time that the production of documents was made initially, commission reports were just not printed out by predecessor counsel. And then we had the loss of the system in the interim and that's the reason why we never produced commission reports."). It is thus difficult for this court to imagine any other format in which the commissions could be listed.

report produced by plaintiffs for the week of June 10, which lists Elissaoui's name as "MEIR Mohamed El Issaoui." PE 1-1. Accordingly, once again, the documents produced and testimony given by plaintiffs demonstrate to this court that the timesheets produced by defendants were altered.

Finally, even defendants' own, non-party witness supports this court's conclusion that defendants altered the employee timesheet reports they produced in this case. Iulia Iacovlev, a former employee of defendants, after being shown copies of both plaintiffs' and defendants' employee timesheet reports, see PE 1-1, PE 2-1, PE 3-1, identified the employee timesheet report produced by plaintiffs as looking familiar. Iacovlev Dep., Dkt. #69-1, at 22; see also Sept. 12 Tr. at 102 (Iacovlev testified that PE 1-1 looked familiar because she received the same document with her paycheck every week, but also testified that a timesheet produced by defendants looked as if it was in the same format as those she would receive). She testified that she received a document similar to plaintiffs' timesheet with her paycheck when she was employed by defendants. Id.

All of these circumstances raise serious questions about the accuracy of the employee timesheet reports produced by defendants, and "powerfully suggest" that the records "were fabricated." Hernandez, 2016 WL 3248493, at *7. These questions become full-fledged doubts in light of defendants' failure to preserve electronic data pertaining to the creation (or alteration) of these same records.

**F.     The Alleged Theft of the Computer Server**

During a settlement conference on July 20, 2015, Elissaoui produced his timesheet for the week of July 10, 2013. See Pls.' Br. at 6. As discussed, that timesheet indicates that Elissaoui worked 53.90 hours that week. See Pls.' Ex. 1. But the timesheet produced by defendants for

the same workweek indicates that Elissaoui worked only 39.11 hours. Pls.' Ex. 2. That same

day, on July 20, 2015, plaintiffs' counsel sent defendants' counsel[20] a "Demand for Preservation"

letter, in which he gave notice to defendants that "they are not to destroy, conceal, or alter in any

manner any electronic data pertaining or relevant to or properly discoverable in the above

referenced matter including all computers owned or in the possession of any of the Defendants."

See Ex. 3 to Pls.' Br., Dkt. #54-5, at 1. It also stated,

> Please note, that as hard copies do not preserve electronic
> searchability or metadata, they are not an adequate substitute for, or
> cumulative of, electronically stored versions. If information exists
> in both electronic and paper forms, Defendants should preserve both
> forms.

Id. at 3. On August 4, 2015, in a conference before Magistrate Judge Orenstein, defendants'

then-counsel moved to withdraw from the case. Defendant Boumoussa was present at this

conference. After granting that motion, the Court ordered Boumoussa not to "make any attempt

to change what's on [his file server], to delete information or change information about what

happened in the past." Tr. of Aug. 4, 2015 Status Conf. at 14:11-14:19, Ex. 4 to Pls.' Br., Dkt.

#54-5. Later that day, in a minute entry filed on the electronic docketing system, the court

ordered defendants to "disclose the location of their computer servers and to preserve without

deletion or alteration all computer records of past transactions on their computers." Minute

Order dated Aug. 4, 2015, Dkt. #31. Plaintiffs' counsel mailed a second Demand for

Preservation letter—along with the August 4 Minute Order—to Boumoussa on August 10, 2015.

See Ex. 6 to Pls.' Br., Dkt. #54-5.

Baghdadi testified that when she arrived at work on September 12, 2015, she "found that

the plaza had been broken into." Baghdadi Test. ¶¶ 1, 15-16. She testified that the thief had

---

[20]     At that time, a different law firm—Braverman, PLLC—represented defendants.

"removed the cash drawer from the cash register; the office computer; the office computer monitor; and a petty cash box." Id. ¶ 17. Baghdadi called the police, reported the theft, and called Boumoussa, "who was out of the country at the time." Id. ¶¶ 18, 24; see also Boumoussa Test. ¶ 33 ("I was out of the country on September 12, 2015."). Elmoutauakil also spoke with police. Id. ¶ 19; Elmoutauakil Test. ¶¶ 3, 34. Police came to the premises on the day of the break-in, but after that visit, Baghdadi testified that she was unaware that the police were seeking further information. Baghdadi Test. ¶¶ 22-23, 27.

The police wrote a complaint regarding the theft, which states,

> Reporter states she locked the business up last night at above time. Upon returning in the morning, noticed the front door was damaged by unknown perp with unknown object. Perp did enter establishment and removed above listed property [a register drawer, a Dell computer monitor, a box of U.S. coins, a Dell computer hard drive, and U.S. currency] from location without permission or authority to do so. Canvass conducted. Video cameras at the location but are out of service. Reporter states perp gained access to lot through side gate lock. Was left off. Manager states she locked up location at end of shift. ECT notified. PDU notified. SGT on scene.

PE 12-3, 12-4. The reporter is listed as Zineb Baghdadi. Id. at 12-7. The police wrote on the complaint report that the total value of these materials was $430.00. Id. at 12-4. Baghdadi testified at trial that she provided estimates of the value of the items that were stolen to the police, and she listed the value of the Dell computer hard drive as having a value of $0.00. Sept. 13 Tr. at 80; PE 12-7.

The police records then indicate that a detective followed up on the complaint through nine separate attempts to contact the individuals at YFA, and specifically that he attempted to make contact on: (1) Friday, September 18, 2015, in person at YFA; (2) Tuesday, September 29, 2016, in person at YFA; (3) Wednesday, October 7, 2015, by telephone; (4) Tuesday, October

23

13, 2015, by telephone; (5) Thursday, October 22, by telephone; (6) Friday, October 30, 2015, by telephone; (7) Friday, November 6, 2015, by telephone; (8) Friday, November 13, 2015, by telephone; and (9) Monday, November 23, 2015, in person at YFA. Id. at 12-9.

When the detective investigating this case made in-person visits, he left his card each time with an individual and requested to be contacted. Id. at 12-13, 12-15, 12-24. When he placed phone calls attempting to get in touch with Baghdadi, he did so at various times of day— at 1:50 P.M., 12:45 P.M., 6:30 P.M., 8:30 A.M., 2:55 P.M., 4:25 P.M., and 5:10 P.M.—and always left a voicemail.[21] Id. at 12-15, 12-16, 12-18, 12-19, 12-20, 12-21, 12-22. "On November 28, 2015, at approximately 1035 hours this case was closed . . . due to numerous attempts (9) for the reporter to return my calls in regards to this investigation." Id. at 12-25.

Elmoutauakil and Boumoussa testified that there had been two prior break-ins of the office about four to five months prior to the September break-in, Elmoutauakil Test. ¶ 39, but nonetheless the police noted in its report that the video cameras on location were out of service. PE 12-3, 12-4. Elmoutauakil testified that he had been unaware that police were seeking further information about the September break-in. Elmoutauakil Test. ¶ 37. Both Elmoutauakil and Boumoussa testified that Boumoussa was the only person who checked telephone messages at YFA, Elmoutauakil Test. ¶ 40; Boumoussa Test. ¶ 39, but—without further explanation— Boumoussa testified that "[he] was never made aware that any member of the police department was seeking further information about the break-in after the day that the break-in occurred." Boumoussa Test. ¶ 38. This testimony is simply incredible. Defendants have provided no reason for failing to follow up with the police. The entire sequence of events suggests to this

---

[21]     There was some testimony at trial regarding whether Baghdadi gave police the correct area code for her cell phone. But Baghdadi confirmed that her cell phone number had a 917 area code, which is also the area code of the cell phone number listed in the police records. Sept. 13 Tr. at 80 (Baghdadi Test.); PE 12-4, 12-7, 12-16, 12-18, 12-19, 12-20, 12-21, 12-22.

court that defendants purposefully destroyed their records to avoid liability in this lawsuit. At the very best, defendants were reckless in failing to preserve the same.

I find that all the indicia discussed above signifying that defendants' documents were altered—combined with defendants' utter and wholly inexplicable lack of effort to preserve electronic data related to the creation of those documents—renders the same documents unreliable and inaccurate for the purpose of determining plaintiffs' hours in this lawsuit. Because I find defendants' timesheets inaccurate, it follows that I also cannot rely on their payroll history reports that are based on plaintiffs' hours as set forth in the timesheets. Instead, I credit plaintiffs' credible and consistent testimony regarding their own hours. See Hernandez, 2016 WL 3248493, at *7 ("Plaintiffs' credibly testified to the contrary—that they were paid sums per week that were generally constant, and that they were never paid according to an agreed-upon hourly rate.").

## G.   Recordkeeping

I find that at no time did defendants give plaintiffs a notice—in English or in any other language—regarding the employees' rates of pay, basis of pay (e.g. hourly, weekly, or other), or any tip credit defendants may have been claiming.

Ayala testified that at a certain point in his employment—after Boumoussa told him he was going to be paid on an hourly basis—he "was shown pay stubs each week that regularly showed about 62 or 63 hours per week, but [he] was never given copies." Ayala Test. ¶ 17. Vega testified that he received a timesheet each week from the secretary, and that he would sign these timesheets, but was never given a copy of them. Vega Test. ¶ 11. He testified that these timesheets were "sometimes missing a few hours." Id. Elissaoui testified that "[e]ach week there was a paper showing the dollar amount I got and it had the hours worked," and that

sometimes, at the direction of a secretary, he would sign that paper. Elissaoui Test. ¶ 13. He testified that it "always showed less hours than [he] had actually worked." Id.

Ayala testified that he "was never told whether [he] was having taxes taken out, nor was [he] ever given anything showing how much was being taken out." Ayala Test. ¶ 17. He testified that "was never given any statement showing how much [he] was going to be paid per hour, nor was [he] ever given any document, ever, which explained how [his] weekly pay was being computed." Id. ¶ 18. The other plaintiffs largely testified to the same. See Garcia Test. ¶ 16; Vega Test. ¶¶ 15-16; Elissaoui Test. ¶ 25.

Boumoussa testified as follows:

> The accountant would send me three check calculations on each page and fax me the pages. I would cut them by hand into three individual pieces of pa[per] and put one in each envelope for each employee along with a time sheet report and an accompanying check.

Boumoussa Test. ¶ 12. As discussed above, I do not credit Boumoussa's testimony and find that he did not provide the required information to plaintiffs. It is clear to this court that the extent of Boumoussa's recordkeeping efforts was to ensure the appearance of compliance with federal and state wage and hour laws—but not compliance itself. See Sept. 12 Tr. at 115 ("My accountant instructed me that we—that I needed to meet the minimum wage and he gave me a rough number[] if it was about $90 a week and on a 40-hour week[,] what the money that I was paying them[,] the commissions and the tips[,] and that I would meet the legal requirements on the minimum wage.").

Defendants did not produce any reliable, accurate documents or testimony to counter the plaintiffs' testimony that they did not receive reports from defendants regarding their rates of pay, basis of pay, or application of any tip credit. See, e.g., Ayala Test. ¶ 18 ("I was never given

any statement showing how much I was going to be paid per hour, nor was I ever given any document, ever, which explained how my weekly pay was being computed. I never received any document like that when I started, on a weekly basis, or at any other time."); Garcia Test. ¶ 16 (same); Elissaoui Test. ¶ 25 (same); Vega Test. ¶¶ 15-16 (stating that he never received an annual wage notice and that he never received a written notice providing information about his wages). Accordingly, I find that defendants did not give plaintiffs notices or statements providing any information about their rates of pay, bases of pay, or the application of any allowances such as tip credits.

## H.    Plaintiffs' Hours and Pay

I find that, based on plaintiffs' testimony, each plaintiff worked the dates of employment, hours, and wages to which he testified, as set forth above.[22] Defendants, however, seek to rely on "tip credits" in this case.[23] Defendants' counsel argued in his brief on this issue that "auto lube workers are routinely tipped as part of their job by the customers and . . . the tip receipts reflect[] a regular and steady amount of tips being received and distributed." Defs.' Mem. of Law on Applicability of Tip Credit, Dkt. #75, at 6. Defendants' counsel clarified at trial that the tips upon which defendants are relying for purposes of "tip credit" are both those given to plaintiffs by customers and, at least at some point in time, commissions. Sept. 12 Tr. at 7, 9, 67. As a factual matter, it appears to this court that the commissions paid to plaintiffs—and not

---

[22]    It is likely that each plaintiff worked more, or fewer, hours in a given week than those to which they testified. But because I find that defendants' records depicting the same are inaccurate, such imprecision has led me to, of necessity, make findings regarding plaintiffs' general work schedules. See also Hernandez, 2016 WL 3248493, at *14 ("The Court's estimates are necessarily in the form of approximations, but they reflect just and reasonable inferences from the available evidence.").

[23]    This discussion is only pertinent to Ayala and Elissaoui, the two plaintiffs against whom defendants seek to claim tip credit. Accordingly, I only address relevant testimony as to those two plaintiffs.

27

tips—are largely the source of money that form the basis for the "tip credit" upon which defendants seek to rely.

As discussed above, each plaintiff testified that he earned both commissions and tips. Ayala Test. ¶ 12 (testifying that he received approximately $150.00 per week in commissions "and an additional amount in tips from customers"); Sept. 13 Tr. at 8-10 (Elissaoui Test.). By and large, plaintiffs kept the cash tips that customers gave them, and defendants did not regulate these tips or keep records of them. Ayala testified that when customers gave him tips, he kept this money to use for his lunch and breakfast, and did not report the amount of his tips to Boumoussa or the secretary. Sept. 12 Tr. at 62. Plaintiffs' manager at the shop testified that the plaintiffs received commissions and wages, but that he did "not know about the workers receiving tips." Elmoutauakil Test. ¶¶ 20, 24. Boumoussa testified that plaintiffs were paid hourly wages by check, and "tips and commissions . . . in cash." Boumoussa Test. ¶ 11. Boumoussa also testified that "the employees received tips from customers which I did not handle and which they kept for themselves." Id. (emphasis added).

The commissions that plaintiffs received "were per unit payments at a set amount for each installation or task performed. For example, $5.00 was paid for each brake replacement, $2.00 for performing each rotor service, etc." Ayala Test. ¶ 13. Elissaoui testified that he would enter his initials into a system along with the work that he had done, and "[a] commission report could then be generated [that] would give [him] credit for all the work [he] did so [he] could earn [his] commissions on it." Elissaoui Test. ¶ 17. He testified that the commission reports "were almost always accurate and give [him] credit for all the work [he] did." Id. In contrast to tips, Boumoussa provided detailed testimony regarding the recording of commissions. He testified that "[i]n order to incentivize [his] employees, [he] would also pay them commission[s] on every

28

item they installed or worked on in a customer's car." Id. ¶ 17. He testified that he would print out weekly commission reports totaling the amount of commission pay that an employee would receive for the week, place this additional pay into an envelope with the commission report, and provide it to the employee. Id. ¶¶ 19-20. Boumoussa's testimony, then, suggests that it was not tips from customers, but instead commissions from Boumoussa, that formed the basis of the money that constituted defendants' "tip credits."

This conclusion is supported by the commission reports themselves, which plaintiffs produced as exhibits. See PE 5-7, 14. The photocopies of the envelopes in which the commission reports were provided to plaintiffs depict writing on them signifying that the enclosed contents were tips. See, e.g., PE 5-9 (entitled "Mohamed's tips"); 5-32 (same). Indeed, defense counsel asked Elissaoui during the course of trial, "[W]asn't it customary at the plaza for the commissions to be referred to as tips from time to time?" Sept. 13 Tr. at 11. Elissaoui testified that the secretary would sometimes use the word "tips" on the envelopes in which plaintiffs were given their commissions. Id.

There is some testimony that contradicts the above. Elissaoui testified that, when he received tips from customers, he would sometimes receive those tips directly from customers, but he would also sometimes receive the tips from the cashier, after the customer handed the cashier the tip. Sept. 13 Tr. at 29. When he received tips directly from customers, he did not report those tips to anyone employed by defendants. Id. at 30. He only received around $10.00-$20.00 per week in tips, and in some weeks, he did not receive any tips. Id. And Iacovlev testified that every few weeks customers would leave "a couple of bucks" with her as tips for the mechanics, in which case she would "make a note of the name of the mechanic and the amount" for Boumoussa, and she would give the money to the mechanic. Sept. 12 Tr. at 96, 106. But

29

even if this testimony is true—and some record was made regarding tips—that record would not show large amounts of cash being earned on a weekly basis in tips, which the purported record of the same shows in defendants' produced records, see DE B-1-B-407.

Accordingly, I conclude that the "tips" for which defendants seek to obtain tip credit were actually, for the most part, commissions that defendants paid plaintiffs for their work on services performed and parts sold. As will be discussed below, commissions cannot form the basis for a tip credit. But even assuming that the commission payments could constitute tips for purposes of receiving tip credit (or that some other payment constitutes the "tips" upon which defendants rely), I find that, as a matter of fact, "plaintiffs were not informed that their tips would be used to offset defendants' minimum wage [and overtime] obligations." Hernandez, 2016 WL 3248493, at *11. Ayala and Elissaoui both testified that they were not told this information. See Sept. 12 Tr. at 42 (Ayala Test.); Sept. 13 Tr. at 31 (Elissaoui Test.).

I also find that, as a factual matter, Ayala and Elissaoui were not informed that commissions or tips were intended to offset or impact their rate of pay. Boumoussa testified at trial that he told plaintiffs he would pay them the legal minimum wage, and "[t]hat we apply the commission, and also they would be getting tips[, and] that the accountant would be able to handle the requirements when it came to figuring out the hours and how . . . the tips would be applied." Sept. 12 Tr. at 114. I find that Boumoussa's testimony on this point is as inaccurate as his testimony on any other relevant issue.[24] But even if Boumoussa had told plaintiffs what he testified to telling them, "this inexact formulation would have been inadequate to communicate

---

[24]      Indeed, the only testimony by plaintiffs that remotely supports Boumoussa's claim is by Vega, who stated that he told Boumoussa that he "wanted more for all these hours, and he said that [Vega] would be getting commissions as well, so [Vega] accepted this." Vega Test. ¶ 7. But defendants did not seek to use a tip credit against Vega's wages, only against Ayala's and Elissauoi's.

to a delivery worker that the tips would serve as an offset to the statutory minimum-wage entitlement, a concept that [Boumouss's] locution nowhere mentions." Hernandez, 2016 WL 3248493, at *12.

I.      **Wage Deductions**

I credit all four plaintiffs' recollections regarding wages that defendants withheld from them, both at the beginning of their employment with defendants and as a result of certain damages that occurred to customers' vehicles during their employment, as set forth above. I do not find credible Boumoussa's testimony that "AMS never held back a deposit from any employee," Boumoussa Test. ¶ 28, and that "[i]n the event an employee damaged a customer's car, [he] left it to the employee to determine how to reimburse AMS if AMS had to make the customer whole," id. ¶ 29. See also id. ¶ 30 ("Even if the employee elected not to pay anything back to AMS, that employee suffered no consequences as a result of taking that position. While it was [rare] that an employee would damage a customer's car, in the rare times that it did happen, the employee agreed to pay AMS back."). At any rate, Boumoussa testified that none of the four plaintiffs in this case "as a matter of pride would volunteer to contribute to pay for damage to a customer's vehicle." Sept. 12 Tr. at 163. I thus find that defendants deducted money from plaintiffs' wages.

## CONCLUSIONS OF LAW[25]

A.      **Liability Under the FLSA**

a.      <u>Applicability of the FLSA and NYLL</u>

To benefit from the FLSA, a plaintiff must first demonstrate that (1) his employer is an "enterprise engaged in commerce or in the production of goods for commerce"; (2) he is an

---

[25]     This court has subject matter jurisdiction over the instant FLSA claims pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 216, and supplemental jurisdiction over plaintiffs' NYLL claims pursuant to 28 U.S.C. § 1367.

"employee" of the defendants, as that word is defined by the statute; and (3) the relationship does not fall within one of the FLSA's exceptions. See 29 U.S.C. § 207(a); see also Tony & Susan Alamo Found., et al. v. Sec'y of Labor, 471 U.S. 290, 295 (1985).

As to the first requirement, a plaintiff must demonstrate that a defendant "has employees engaged in commerce" or that the defendant itself is an "enterprise engaged in commerce," and that the defendant has "annual gross volume of sales made or business done [in an amount] not less than $500,000." 29 U.S.C. § 203(s)(1)(A)(i)-(ii). The test to be an enterprise "engaged in commerce" is met "so long as [a defendant's] employees merely handled equipment or supplies that originated out-of-state." D'Arpa v. Runway Towing Corp., No. 12-CV-1120, 2013 WL 3010810, at *13 (E.D.N.Y. June 18, 2013); see also Archie v. Grand Cent. P'ship, Inc., 997 F. Supp. 504, 530 (S.D.N.Y. 1998) ("[L]ocal business activities fall within the reach of the FLSA when an enterprise employs workers who handle goods or materials that have been moved or been produced in interstate commerce."). Here, "it is inconceivable that none of the [automobile materials] used by [p]laintiffs in their line of work originated outside of New York," D'Arpa, 2013 WL 3010810, at *13, and the parties do not dispute that AMS meets this definition. The parties have also stipulated that AMS "had gross receipts of not less than $500,000.00 during each of the years 2011 through 2014, inclusive." Stipulation, Dkt. #40, at 1.

As to the second requirement, subject to certain exceptions inapplicable here, the FLSA defines an "employee" as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). In turn, it defines an "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee."[26] Id. § 203(d). The parties have stipulated that

---

[26] "The statutory standard for employer status under the NYLL is nearly identical to that of the FLSA." Hernandez, 2016 WL 3248493, at *22 (citing 29 U.S.C. § 203(d); N.Y. Lab. Law § 190(3)). Although "[n]either the New York Court of Appeals nor the Second Circuit has decided whether the tests for 'employer' status are the same

"[t]hroughout all relevant periods asserted in the [p]laintiffs' [s]econd [a]mended [c]omplaint, there existed an employer-employee relationship between [AMS] and Boumoussa and each of the [p]laintiffs." JPTO at 5. The parties have also stipulated that AMS and Boumoussa "jointly employed each of the [p]laintiffs in this action within the meaning of 29 U.S.C. § 207(a)(1)," and that Boumoussa "had the power to hire and fire employees, supervised and controlled employee work schedules and conditions of employment, determined the rate and method of payment for all employees, and maintained all employment records for the aforesaid corporate defendant." Id. Accordingly, I find that both Boumoussa and AMS were plaintiffs' employers under the FLSA and within the meaning of Section 651 of the NYLL during the plaintiffs' relevant periods of employment.

But the parties disagree as to YFA's liability. Plaintiffs argue that AMS and YFA together constitute a "single integrated enterprise" engaged in commerce or in the production of goods for commerce with an annual gross volume of sales of at least $500,000 for the years 2011 through 2014. See Pls.' Pretrial Br. Concerning the Issue of Whether the Two Corp. Defs. Are a Single Integrated Enterprise ("Pls.' Joint Employer Br."), Dkt. #69-2, at 1-2. Defendants argue that first, "the Second Circuit has not yet ruled on whether the integrated enterprise test should be applied to FLSA claims," and second, that plaintiffs have failed to allege that YFA had any

---

under the FLSA and the NYLL, . . . district courts in this Circuit have consistently interpreted the definition of 'employer' under the New York Labor Law coextensively with the definition used by the FLSA." Inclan v. N.Y. Hosp. Grp., Inc., 95 F. Supp. 3d 490, 511 (S.D.N.Y. 2015) (citations and internal quotation marks omitted); see also Jin Dong Wang v. LW Rest., Inc., 81 F. Supp. 3d 241, 258 (E.D.N.Y. 2015) (collecting cases and noting that "[d]istrict courts in this Circuit 'have interpreted the definition of 'employer' under the New York Labor Law coextensively with the definition used by the FLSA'" (quoting Spicer v. Pier Sixty LLC, 269 F.R.D. 321, 335 n.13 (S.D.N.Y. 2010))). The following discussion thus applies to both statutes.

However, "[u]nlike the FLSA, the NYLL does not require that a defendant achieve a certain minimum in annual sales or business in order to be subject to the law." Morales v. Mw Bronx, Inc., No. 15-CV-6296, 2016 WL 4084159, at *7 (S.D.N.Y. Aug. 1, 2016) (citing NYLL § 651(6)).

control of labor relations. Defs.' Mem. of Law on Joint Employer Status ("Defs.' Joint Employer Br."), Dkt. # 69-2, at 5.

The "single integrated enterprise" doctrine allows for multiple defendants to be jointly and severally liable for any FLSA and NYLL violations. See, e.g., Perez v. Westchester Foreign Autos., Inc., No. 11-CV-6091, 2013 WL 749497, at *7 (S.D.N.Y. Feb. 28, 2013). "To establish single employer liability, courts employ a four-factor test, analyzing the extent of: (1) the interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." Garcia v. Chirping Chicken NYC, Inc., No. 15-CV-2335, 2016 U.S. Dist. LEXIS 32750, at *20 (E.D.N.Y. Mar. 31, 2016).

"While the Second Circuit does not appear to have 'expressly applied the integrated enterprise test in the FLSA context,' Teri v. Spinelli, 980 F. Supp. 2d 366, 372 n.12 (E.D.N.Y. 2013), the Court finds sufficient support for its application here." Coley v. Vannguard Urban Improvement Ass'n, Inc., No. 12-CV-5565, 2016 WL 4179942, at *5 (E.D.N.Y. Aug. 5, 2016) (citing United States v. Stanley, 416 F.2d 317, 318 (2d Cir. 1969)); but see Hart v. Rick's Cabaret Int'l, Inc., 967 F. Supp. 2d 901, 940 n.16 (S.D.N.Y. 2013) (declining to apply the integrated enterprise test, but noting that any such application would not, in any event, change the outcome of the court's determination). Indeed, "[t]he Supreme Court has noted the 'expansiveness' of the FLSA's definition of 'employer.'" Morangelli v. Chemed Corp., 922 F. Supp. 2d 278, 284 (E.D.N.Y. 2013) (quoting Falk v. Brennan, 414 U.S. 190, 195 (1973)); see also Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 326 (1992) (noting that the FLSA defines "employer" expansively and with striking breadth). And the Second Circuit has held that determining employer status for purposes of the FLSA involves a fact-specific inquiry, requiring courts to look at the totality of the circumstances "in light of economic reality." Zheng v.

34

Liberty Apparel Co. Inc., 355 F.3d 61, 71 (2d Cir. 2006); see also Marin v. Apple-Metro, Inc.,
No. 12-CV-5274, 2014 WL 11035376, at *5 (E.D.N.Y. July 29, 2014).  Finally, "the 'shared
policy concerns underlying the doctrine and the FLSA' urge the theory's application to FLSA
claims."  Lopez v. Pio Pio NYC, Inc., 13-CV-4490, 2014 WL 1979930, at *3 (S.D.N.Y. May 15,
2014) (quoting Chen v. TYT E. Corp., 10-CV-5288, 2012 WL 5871617, at *3 (S.D.N.Y. Mar.
21, 2012)).

Plaintiffs argue that here, "it is beyond dispute that both of these corporations are
involved in the same industry, are located at the exact same address, and are wholly owned and
operated by Defendant Boumoussa."  Pls.' Joint Employer Br. at 3 (citing Boumoussa Dep. at
11:13-12:3; 16:24-17:10).  Indeed, defendants do not contest that three of the four considerations
in the integrated enterprise test are met.  Defs.' Joint Employer Br. at 5 ("[T]hree out of the four
factors enunciated in Chen are present with respect to YFA—common ownership, common
management[,] and interrelated operations . . . .").  But defendants argue that YFA only "holds
the license for car inspection and for operation of a repair shop," and thus had no "control of
labor relations."  Id.  Defendants rely on language from a court in this district that held that the
integrated employer doctrine applies only in "extraordinary circumstances where plaintiff
demonstrates sufficient indicia of an interrelationship between the immediate corporate employer
and the affiliated corporation to justify the belief on the part of an aggrieved employee that the
affiliated corporation is jointly responsible for the acts of the immediate employer."  Morangelli,
922 F. Supp. 2d at 285 (internal quotation marks and citations omitted).

I find that such extraordinary circumstances exist here.  Unlike in Morangelli, where the
court found that plaintiffs failed to show that a parent and indirect subsidiary were "single
integrated enterprises" for purposes of FLSA liability when the subsidiary had 50 branches and

110 company-owned service locations, and employed over 1,600 technicians, id. at 282, in this case, the relevant entities are so intertwined that it is difficult to tell where the business of YFA stops and the business of AMS begins. In both Stanley and Coley, the courts relied on—in finding that companies constituted a single employer for liability purposes—the fact that the companies were located at the same address, moved employees from one company to another, and had the same employees perform their bookkeeping. Stanley, 416 F.2d at 318; Coley, 2016 WL 4179942, at *5. These facts are all present in this case. Boumoussa testified that both AMS and YFA are located at 7017 Bay Parkway in Brooklyn, New York. Sept. 12 Tr. at 188. He stated that "no one has any part in the decision-making with respect to the business operations of those corporations except for" himself. Boumoussa Dep. at 12. And he stated in his deposition that licenses are held in YFA's name and that the "sister company," AMS, conducts business transactions. See Boumoussa Dep., Dkt. #69-2, at 7-8.

Moreover, Boumoussa stated that he used to run his automobile repair business under the name YFA, and was unable to recall when he transferred the operations of that business from YFA to AMS. Id. at 16. He refers to his businesses as the "Your Favorite Auto Plaza." Boumoussa Test. ¶¶ 2, 6; Sept. 12 Tr. at 188-89. And plaintiffs correctly note that the police report concerning the alleged theft of the computer server identifies the complainant as YFA, not AMS. See PE 12-2. I find that Boumoussa, the sole owner of these two companies, see Boumoussa Test. ¶ 1, used them interchangeably. Plaintiffs have established that the two entities are a single integrated enterprise for purposes of joint and several liability for the instant claims. See, e.g., Arculeo v. On–Site Sales & Mktg., LLC, 425 F.3d 193, 198 (2d Cir. 2005) (where single-integrated-enterprise theory applies, courts may impose liability for a violation "not only

36

on the nominal employer but also on another entity comprising part of the single integrated employer").

As to the third requirement, the parties have stipulated that "[n]one of the [p]laintiffs' employment fell under any exemption from the FLSA or the NYLL requirement to pay time and half for overtime to an[] employee working in excess of 40 hours in any given week." JPTO at 5. I thus proceed to the merits of plaintiffs' claims.

      b.    <u>FLSA and NYLL Violations</u>

The FLSA provides that "no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). To establish liability for unpaid overtime pursuant to the FLSA, "a plaintiff must prove that he performed work for which he was not properly compensated, and that the employer had actual or constructive knowledge of that work." <u>Kuebel v. Black & Decker Inc.</u>, 643 F.3d 352, 361 (2d Cir. 2011) (citing <u>Anderson v. Mt. Clemens Pottery Co.</u>, 328 U.S. 680, 868-87 (1946)). As with the FLSA, the NYLL provides for certain overtime wages for covered employees. <u>See</u> NYLL § 652. Plaintiffs bear the burden of so proving by a preponderance of the evidence. <u>Hernandez v. NJK Contractors, Inc.</u>, No. 09-CV-4812, 2015 WL 1966355, at *1 (E.D.N.Y. May 1, 2015).

The FLSA also requires employers to "make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him." 29 U.S.C. § 211(c); <u>see also</u> C.F.R. § 516.2(a)(7) (requiring employers to maintain and preserve payroll records that specify the "[h]ours worked each workday and total hours worked each workweek," as well as "[t]otal premium pay for overtime

37

hours" and "[t]otal additions to or deductions from wages paid each pay period"). To prove their claims about failure to pay overtime, plaintiffs must "'produce sufficient evidence to show the amount and extent of [the uncompensated work] as a matter of just and reasonable inference.'" Kuebel, 643 F.3d at 361 (quoting Anderson, 328 U.S. at 687).

This evidence may be established in various ways. For example, "[w]hen the employer has kept proper and accurate records, the employee may easily discharge his burden by securing the production of those records." Anderson, 328 U.S. at 687. On the other hand,

> "where the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes," the [Supreme Court has] concluded that "[t]he solution . . . is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work," as such a result would be contrary to the "remedial nature" of the FLSA.

Kuebel, 643 F.3d at 362 (quoting Anderson, 328 U.S. at 687). The Second Circuit has established that "it is possible for a plaintiff to meet this burden through estimates based on his own recollection." Id. In this case, defendants' records are both inaccurate and inadequate. I find that plaintiffs have met their burden through estimates based on their own credible recollections.

### i.    *Spoliation of Evidence*

Prior to trial in this case, plaintiffs filed a motion in limine seeking default judgment for spoliation of evidence or, in the alternative, preclusion of defendants from presenting any of their electronic employee work records at trial and/or imposition of an adverse inference against defendants for destruction of evidence. See Pls.' Mem. of Law in Supp. of Pls.' Mot. in Limine for Sanctions against Defs. for Spoliation of Evid. ("Pls.' Br."), Dkt. #54-5. I reserved decision

on this motion—which was premised on factual disputes—until after the conclusion of trial.[27]
Plaintiffs now seek to preclude this court from considering "all employment records generated
[to] date which w[ere] originally housed in the Defendants' server." Pls.' Findings of Fact and
Conclusions of Law, Dkt. #54-1, ¶ 89. In addition—or in the alternative—plaintiffs ask this
court to "find[] that [an] adverse inference is appropriate and the Court will infer that the
information in the Defendants' file server that was altered and then destroyed would support the
Plaintiffs' allegations that they each regularly worked over 40 hours a week throughout their
employment with the Defendants." Id. ¶ 90. Plaintiffs assert that, should I find spoliation, I
should look to plaintiffs' testimony to establish the number of hours worked by each of the
plaintiffs (which will, in turn, establish damages). Id. ¶ 91.

"Spoliation is the destruction or significant alteration of evidence, or the failure to
preserve property for another's use as evidence in pending or reasonably foreseeable litigation."
West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999) (citation omitted). To
show spoliation, the moving party must demonstrate that: "(1) the party having control over the
evidence had an obligation to preserve it at the time it was destroyed; (2) the records were
destroyed with a culpable state of mind; and (3) the destroyed evidence was relevant to the
party's claim or defense such that a reasonable trier of fact could find that it would support that
claim or defense." Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 107 (2d Cir.
2002).

---

[27]     Defendants' primary response to plaintiffs' spoliation motion was that plaintiffs' counsel did not seek a
spoliation hearing or seek sanctions related to the theft of the server during discovery, and thus their motion was un-
timely. Defs.' Opp'n and Resp. to Pls.' Mots. in Limine to Preclude Defs.' Use of Documents ("Defs.' Br."), Dkt.
#54-5, at 4-5, 7-8. But defendants admit that the Federal Rules of Civil Procedure do not set a time limit for motions
seeking spoliation sanctions. Id. at 7 (citing Fed. R. Civ. P. 37). And I do not find that in this case defendants were
prejudiced; to the extent that fact issues remained regarding the break-in that the parties wished to, but did not, pur-
sue during discovery, they had the opportunity to do so at trial.

In <u>Yu Chen v. LW Rest., Inc.</u>, No. 10-CV-200, 2011 WL 3420433 (E.D.N.Y. Aug. 3, 2011), the court held that—after defendants' principal had "lost" an original computer drive containing relevant employment documents—the defendants had spoliated evidence. <u>Id.</u> at *8. The court made this finding in reliance on its original determination that "the plaintiffs had the right to have an expert analyze the metadata on the original disk drive, because it was only through an examination of the original that plaintiffs could determine when the [employment] documents were created." <u>Id.</u> at *7.

Here, plaintiffs first contend that it is indisputable that defendants knew they had an obligation to preserve the evidence. Pls.' Br. at 8-9. Plaintiffs had sent defendants two "Demand for Preservation" letters <u>and</u> the court had ordered defendants in a conference and on the electronic docketing system to preserve all computer records relevant to the case. <u>Id.</u> Defendants do not dispute that they knew they had an obligation to preserve the records in question. Defs.' Br. at 7. Accordingly, I find that the computer drive at issue here was solely in defendants' possession, that defendants had complete control over the drive, and that defendants were well aware of the instant litigation, the importance of the records on the computer drive, and plaintiffs' allegations that the payroll documents that defendants had produced were falsified.

Next, plaintiffs argue that—because defendants were on notice that "their scheme to defraud [by altering timesheets] was certain to be scrutinized" based on the conflicting timesheet reports—defendants had a motive to destroy the electronic versions of these records before a computer forensics expert could review defendants' computer server. Pls.' Br. at 9. Plaintiffs' strongest support for this argument stems from defendants' utter failure to pursue their claim that the computer had been stolen, which I set forth in detail above. Police documented <u>nine separate</u>

<u>attempts</u> to contact defendants. Pls.' Ex. 12 at 12-9.  They attempt to contact them by telephone

and in person, and did so on varying days of the week, and at varying times of day.  <u>Id.</u>  They did

so over a period of three months.  <u>Id.</u>  As discussed above, the testimony of Baghdadi,

Elmoutauakil, and Boumoussa that they did not know about these attempts to contact them are

incredible.[28]

 "The law in this circuit is not clear on what state of mind a spoliator must have when

destroying [evidence]."  <u>Byrnie v. Town of Cromwell, Bd. of Educ.</u>, 243 F.3d 93, 107-08 (2d

Cir. 2001).  "Some courts . . . have required a showing of bad faith, some have required proof of

intentional destruction, and others have drawn an inference based on gross negligence."  <u>Yu</u>

<u>Chen</u>, 2011 WL 3420433, at *11.  But at minimum, plaintiffs must show that the evidence was

destroyed either knowingly or negligently.  <u>Id.</u>  In evaluating whether plaintiff has met this

burden, courts acknowledge that discovery misconduct can "occur along a continuum of fault—

ranging from innocence through the degrees of negligence to intentionality."  <u>Reilly v. Natwest</u>

<u>Mkts. Grp., Inc.</u>, 181 F.3d 253, 267 (2d Cir. 1999) (internal quotation marks and citation

omitted).  In this case, "considering the very convenient timing of the loss of the drive, just after

[defendants were put on notice that plaintiffs disputed their employment records, and just after

the court warned defendants not to tamper with the computer drive], the Court finds that this

'loss' is highly suspicious and very clearly constitutes gross negligence."  <u>Yu Chen</u>, 2011 WL

3420433, at *12.  Indeed, given defendants' failure to pursue the alleged theft of their computer

---

[28] Plaintiffs also correctly note that "Defendants did not disclose any documentation substantiating that a claim to their insurance carrier regarding this alleged theft" had been filed.  Pls.' Br. at 5.  Nor, for that matter, did defendants attempt to provide any documentation or testimony that Boumoussa was out of town—and thus purport-edly not checking his messages—for the entire three-month period that the police attempted to contact his business.  And, of course, despite the preservation notice that defendants had received—and despite their testimony that there had been <u>two</u> break-ins at YFA in the 5-6 month period before the September 2015 break-in—they took no steps to make a copy of the server or otherwise safeguard the electronic information stored within it.

server, the loss of that evidence "may have even been intentional." Id. Accordingly, I find that plaintiffs have met their requisite showing of culpability.

As to the last element of a spoliation claim—that the evidence would have been relevant to a party's claims or defenses—there can be no dispute that the data on the missing server is relevant to plaintiffs' claims. As plaintiffs correctly note, that information included "(i) the days the Plaintiffs actually worked; (ii) the times the Plaintiffs began working; (iii) the times the Plaintiffs stopped working; and (iv) when the Defendants altered the data in the server to show that the Plaintiffs worked under 40 hours per week." Pls.' Br. at 10. Defendants do not dispute that the records in question were relevant to this case. Defs.' Br. at 7. The fact that hard copies of these records exist does not alter their relevance to this case; "plaintiffs are deprived of the opportunity to have their expert evaluate the disk." Yu Chen, 2011 WL 3420433, at *12.

Where there is a "breach of a discovery obligation[, and this breach] is the non-production of evidence, a district court has broad discretion in fashioning an appropriate sanction, including . . . an adverse inference." Residential Funding Corp., 306 F.3d at 107. "[A]t the end of the day the judgment call of whether to award sanctions is inherently subjective. A court has a 'gut reaction' based on years of experience as to whether a litigant has complied with its discovery obligations and how hard it worked to comply." Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., L.L.C., 685 F. Supp. 2d 456, 471 (S.D.N.Y. 2010), abrogated on other grounds by Chin v. Port Auth. of N.Y. & N.J., 685 F.3d 135, 162 (2d Cir. 2012). The bottom line is that the court must determine whether the defendants' "[c]onduct is . . . acceptable or unacceptable." Id. at 463-64. If they find it unacceptable, courts have "leeway to tailor sanctions to ensure that spoliators do not benefit from their wrongdoing—a remedial

purpose that is best adjusted according to the facts and evidentiary posture of each case." Id. at

469 n.39 (citation omitted).

I find that defendants have spoliated evidence in this case. Any sanction imposed

"should be 'molded to serve the prophylactic, punitive and remedial rationales underlying the

spoliation doctrine,' which is predicated upon the rationale that by destroying evidence, one

party has deprived the other of the ability to prosecute or defend an action." Sterbenz v. Attina,

205 F. Supp. 2d 65, 74 (E.D.N.Y. 2002) (quoting Goodyear Tire & Rubber Co., 167 F.3d at

779). Here, I have already determined that defendants' records are inaccurate, and I do not credit

them. Although I do not find that entering default judgment would be appropriate, I do find that,

as a sanction for defendants' spoliation, these records are excluded from evidence. See Yu Chen,

2011 WL 3420433, at *20 ("Although defendants' conduct was grossly negligent and

irresponsible, approaching the 'extreme circumstances' that would justify the draconian remedy

of default, the Court declines to order entry of default at this time.").

      ii.    *Tip Credit*

To determine whether defendants violated the FLSA's and NYLL's minimum wage and

overtime provisions, I must also address whether defendants are entitled to take a tip credit

against their overtime obligations for tips allegedly received by plaintiffs. The FLSA states that

"an employer [may] pay a tipped [employee] a cash wage that is lower than the statutory

minimum wage, provided that the cash wage and the employee's tips, taken together, are at least

equivalent to the minimum wage." Inclan, 95 F. Supp. 3d at 497 (citing 29 U.S.C. § 203(m)).

The resulting allowance is called a "tip credit." An employer may not take a tip credit unless (1)

"each employee has been informed by the employer of the [tip credit] provision"; and (2) "all

tips received by such employee have been retained by the employee." 29 U.S.C. § 203(m). This

provision is strictly construed. Hernandez, 2016 WL 3248493, at *23. At minimum, § 203(m)'s

notice provision requires "notice to employees of the employer's intention to treat tips as

satisfying part of the employer's minimum wage obligations." Id. (internal quotation marks and

citations omitted) (collecting cases). The notice need not be in writing. See Copantitla v.

Fiskardo Estiatorio, Inc., 788 F. Supp. 2d 253, 287-88 (S.D.N.Y. 2011). The employer bears the

burden of demonstrating its compliance with the strictures of § 203(m); if it cannot so prove, it

cannot take a tip credit. See, e.g., Inclan, 95 F. Supp. 3d at 497.

As discussed above, I find that the "tips" used by defendants in taking tip credit as to

plaintiffs Ayala and Elissaoui were actually commissions that plaintiffs received as per unit

payments for installations or tasks performed. The Department of Labor has defined a tip as "a

sum presented by a customer as a gift or gratuity in recognition of some service performed for

him." 29 C.F.R. § 531.52. New York regulations define a tip as a "voluntary contribution[]

received by the employee from a guest, patron, customer or other person for services rendered."

12 N.Y.C.R.R. § 142-2.21. By contrast, "[t]he essence of a commission is that it bases

compensation on sales, for example a percentage of the sales price." Yi v. Sterling Collision

Ctrs., Inc., 480 F.3d 505, 508 (7th Cir. 2007). I find that the commissions that defendants restyle

as "tips" cannot form the basis for a tip credit under federal or state law.[29]

Even assuming that the commission payments could constitute tips for purposes of

receiving tip credit (or that some other payment constitutes the "tips" upon which defendants

rely), as discussed above, I find that defendants did not comply with the state and federal

statutory notice requirements. Defendants never informed plaintiffs that tips would be used to

---

[29]     I also note that defendants have conceded that "commissions do not count as an offset [to any overtime wages owed] and can be used by Plaintiffs to calculate overtime wages owed [as part of the regular rate of pay], if the performance of overtime is established at trial." See Letter, Dkt. #65, at 1.

satisfy minimum wage and overtime obligations.  And because plaintiffs were never informed as to the hourly wage they were receiving, it follows that "plaintiffs here were never told that their wages would be reduced below the minimum wage on account of tips received."  Hernandez, 2016 WL 3248493, at *24.

Defendants nonetheless argue that because they are "car wash and automotive employees, plaintiffs are not governed by the same statutory section of the NY Labor Law as restaurant and hospitality workers," and defendants are thus not subject to any particular notice provisions. Defs.' Mem. of Law on Applicability of Tip Credit ("Defs.' Tip Credit Br."), Dkt. #75, at 5-6. But defendants gloss over several provisions of § 142, which covers "Miscellaneous Industries and Occupations."[30]  First—as defendants acknowledge—in order to apply a tip credit, they must comply with § 142-2.5 of the New York regulations, which requires that an employee be engaged in an occupation in which "tips have customarily and usually constituted a part of the employee's remuneration," that employers have evidence showing that the employee received the tips in the amount claimed, and that employers record the amount claimed on a weekly basis as a separate item in the wage record.  12 N.Y.C.R.R. § 142-2.5.  Employers must also "establish, maintain and preserve for not less than six years, weekly payroll records which shall show for each employee . . . allowances, if any, claimed as part of the minimum wage."  Id. § 142-2.6(a)(8).  Further, [e]mployers must "furnish to each employee a statement with every payment of wages, listing . . . allowances, if any, claimed as part of the minimum wage."  Id. § 142-2.7.  Finally, employers "shall post in a conspicuous place in his or her establishment a notice issued by the Department of Labor summarizing minimum wage provisions."  Id. § 142-

---

[30]      Section 146 covers workers in the hospitality industry.

45

2.8. Defendants have not produced accurate documents or other evidence showing their compliance with these provisions.[31]

I thus find that under state and federal law, defendants may not use a tip credit so as to reduce the overtime wages they were obliged to pay these plaintiffs.[32]

### iii.   *Overtime Violations[33]*

I find that defendants violated the FLSA's and NYLL's overtime provisions as to all plaintiffs. And, as set forth above, in the absence of an employer's adequate records, I rely on plaintiffs' estimates based on their own recollection as to hours worked and wages earned. See Kuebel, 643 F.3d at 362. "If the employer fails to [rebut plaintiffs' estimates and provide evidence of the precise amount of work performed by an employee], the court may then award damages to the employee, even though the result be only approximate." Anderson, 328 U.S. at 687-88. Accordingly, based on my assessment of plaintiffs' testimony and the other evidence presented at trial, I conclude that the general hours worked by plaintiffs entitle them to overtime pay.[34] I additionally find that certain regulations apply to the calculation of overtime in this case.

---

[31]   There was some testimony that, at least during certain points in time during plaintiffs' employment, defendants had placed a poster listing the minimum wage in an office. See Sept. 13 Tr. at 5 (Elissaoui Test.).

[32]   Because I find that defendants cannot take a tip credit on the facts presented to this court at trial, I need not address plaintiffs' claim that defendants improperly took a larger tip credit than that allowed under the NYLL. See Pls.' Pretrial Br. Concerning the Applicability of the Tip Credit, Dkt. #76, at 5-7.

[33]   The New York Labor Law "is the state analogue to the federal FLSA." Santillan v. Henao, 822 F. Supp. 2d 284, 292 (E.D.N.Y. 2011); see also Ethelberth v. Choice Sec. Co., No. 12-CV-4856, 2015 WL 861756, at *14 (E.D.N.Y. Feb. 27, 2015) ("[C]ourts in the Second Circuit have generally applied their analysis of a plaintiff's FLSA claim to a plaintiff's NYLL claim due to the substantial similarity in the provisions . . . ."). The NYLL "does not require a plaintiff to show either a nexus with interstate commerce or that the employer has any minimum amount of annual sales," but otherwise follows the FLSA's overtime requirements. Chun Jie Yin v. Kim, No. 07-CV-1236, 2008 WL 906736, at *4 (E.D.N.Y. Apr. 1, 2008). Accordingly, the following discussion applies to plaintiffs' federal and state claims equally.

[34]   The amount of this pay shall be briefed by the parties in accordance with this Opinion & Order, and determined, in the first instance, by Magistrate Judge Orenstein.

When an employee receives a fixed weekly salary, the first step in calculating the rate at which that employee should receive overtime pay is to determine the "regular rate of pay," that is, the employee's fixed salary divided by the number of hours worked in a particular week. Solis v. Tally Young Cosmetics, LLC, No. 09-CV-4804, 2011 WL 1240341, at *8 (E.D.N.Y. Mar. 4, 2011) (citing 29 C.F.R. § 778.112 ("If the employee is paid a flat sum for a day's work or for doing a particular job, without regard to the number of hours worked in the day or at the job, and if he receives no other form of compensation for services, his regular rate is determined by totaling all the sums received at such day rates or job rates in the workweek and dividing by the total hours actually worked.")).

"The governing regulations provide that commissions are considered payment for hours worked and must be included when calculating the regular rate, regardless of whether the commissions are paid weekly or on a less frequent basis." Id. (citing 29 C.F.R. § 778.117 ("Commissions (whether based on a percentage of total sales or of sales in excess of a specified amount, or on some other formula) are payments for hours worked and must be included in the regular rate. This is true regardless of whether the commission is the sole source of the employee's compensation or is paid in addition to a guaranteed salary or hourly rate, or on some other basis, and regardless of the method, frequency, or regularity of computing, allocating and paying the commission.")) (collecting cases).

Plaintiffs have relied on 29 C.F.R. § 778.113 in determining their "regular rate of pay," based on plaintiffs' testimony that they received weekly salaries. Under this regulation, "the regular hourly rate of pay, on which time and a half must be paid, is computed by dividing the salary by the number of hours which the salary is intended to compensate." 29 C.F.R. § 778.113. "For purposes of [the] FLSA, '[t]here is a rebuttable presumption that a weekly salary covers 40

47

hours; the employer can rebut the presumption by showing an employer-employee agreement that the salary covers a different number of hours.'" Moon v. Kwon, 248 F. Supp. 2d 201, 207 (S.D.N.Y. 2002) (quoting Giles v. City of New York, 41 F. Supp. 2d 308, 317 (S.D.N.Y. 1999)). But the regular hourly rate "must be drawn from what happens under the employment contract." 29 C.F.R. § 778.108. "'In the absence of any written instrument memorializing the parties' intentions, the Court must infer the terms of their agreement from the entire course of their conduct, based on the testimonial and documentary evidence in the record.'"[35] Chopen v. Olive Vine, Inc., No. 12-CV-2269, 2015 WL 1514390, at *6 (E.D.N.Y. Mar. 13, 2015) (quoting Moon, 248 F. Supp. 2d at 206), adopted in pertinent part, 2015 WL 1542082 (E.D.N.Y. Mar. 31, 2015).

Plaintiffs' calculations for each plaintiff's regular rate of pay rely on an assumption that each plaintiff's weekly salary was intended as pay only for the first 40 hours worked each week. See Pls.' Proposed Findings of Fact and Conclusions of Law, Dkt. #54-1, ¶¶ 96 ("[Ayala's] regular rate of pay is the sum of his salary, along with all commissions and other compensation divided by the 40 regular hours this salary was meant to cover."); 101 (same as to Elissaoui); 105 (same as to Vega); 109 (same as to Garcia). But not every plaintiff has adequately supported this position for the entirety of the time in which they worked for defendants, "[n]or do I find evidence in the record suggesting that [each plaintiff's] weekly salary was intended to compensate him just for the first forty hours that he worked." Zurita v. High Definition Fitness Ctr., Inc., No. 13-CV-4394, 2016 WL 3619527, at *5 (E.D.N.Y. June 9, 2016).

---

[35] Again, the NYLL takes a similar approach. New York regulations provide that "[t]he term regular rate shall mean the amount that the employee is regularly paid for each hour of work. When an employee is paid on a piece work basis, salary, or any basis other than hourly rate, the regular hourly wage rate shall be determined by dividing the total hours worked during the week into the employee's total earnings." 12 N.Y.C.R.R. § 142-2.16 (emphasis added).

Instead, in calculating each employee's regular rate of pay, the hours that plaintiffs actually kept—from their trial week and through their periods of employment—tend to demonstrate the fact that defendants and plaintiffs had agreed, at least implicitly, that certain plaintiffs, for certain time periods, would work more than 40 hours per week for their weekly salary. See Quiroz v. Luigi's Dolceria, Inc., No. 14-CV-871 (VVP), 2016 WL 2869780, at *3 (E.D.N.Y. May 17, 2016) (when the plaintiff's testimony established that when he was first hired, he was told he would work 54 hours per week, and that plaintiff in fact worked 54 hours each week for the same weekly salary throughout his employment, the court must conclude that "the plaintiff and the defendants had an understanding that the plaintiff's weekly salary was intended to compensate him for 54 hours per week."). However, Ayala and Vega testified that at some point, they began receiving an hourly pay. For those two plaintiffs, during the periods of time in which they testified to receiving hourly pay, I find that their hourly rate was their regular rate of pay. See 29 C.F.R. § 778.110.

As explained below, I will invite the parties to submit revised damages calculations in accordance with my findings as set forth in this opinion.

    c.    <u>Willfulness</u>

"The FLSA generally provides for a two-year statute of limitations on actions to enforce its provisions, but allows a three-year period for 'a cause of action arising out of a willful violation.'" Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 141 (2d Cir. 1999) (quoting 29 U.S.C. § 255(a)). The standard for determining willful behavior is whether "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988). Plaintiffs bear the burden of proving willfulness. Young v. Cooper Cameron Corp., 586 F.3d 201, 207 (2d Cir.

2009). If plaintiffs cannot make such a showing, their claims are subject to a two-year statute of limitations that begins to run for each plaintiff "on the date when the complaint is filed, if he is specifically named as a party plaintiff in the complaint and his written consent to become a party plaintiff is filed on such date in the court in which the action is brought." 29 U.S.C. § 256.

Plaintiffs filed the instant complaint on September 9, 2014. The plaintiffs may therefore obtain recovery under the NYLL for damages accruing from either September 9, 2011 or September 9, 2012. I find that the violations here were willful, and that the appropriate date from which damages should accrue is September 9, 2011. The evidence in this case demonstrates that defendants doctored their records of the hours that plaintiffs kept and used those doctored records to generate check amounts to each plaintiff that purported to be in accordance with relevant wage and hour laws, but were in fact false. The consistency with which defendants appear to have simply deleted hours from plaintiffs' timesheets, and then generated payroll records based on the falsified records, does not signify "ignorant and incurious" conduct; it signifies "willful[] non-complian[ce] with federal law." Hernandez, 2016 WL 3248493, at *18; see also D'Arpa, 2013 WL 3010810, at *5 (finding reckless disregard due to "[d]efendants' method of compensating nearly all of the [p]laintiffs in cash and their arbitrary issuance of W-2s"). I find that such evidence is sufficient to infer that defendants either knew that their pay practices were illegal or showed reckless disregard as to the legality of the same.

Unlike the FLSA, the NYLL provides for a six-year statute of limitations. NYLL § 663(1), (3). The plaintiffs may therefore obtain recovery under the NYLL for damages accruing from and after September 9, 2008. However, "courts do not grant separate awards under both [the FLSA's and NYLL's overtime provisions], because doing so would allow the plaintiff to recover twice for the same loss." Quiroz, 2016 WL 2869780, at *3 (citing Yu G. Ke

v. Saigon Grill, Inc., 595 F. Supp. 2d 240, 262 n.44 (S.D.N.Y. 2008); Chen v. Jenna Lane, Inc.,
30 F. Supp. 2d 622, 625 (S.D.N.Y. 1998)). Instead, courts look to "the statute that provides the
greater recovery to the plaintiff in determining the damages to award for unpaid overtime
wages." Id.; see also Fermin v. Las Delicias Peruanas Rest., Inc., 93 F. Supp. 3d 19, 49
(E.D.N.Y. 2015) ("In determining the statutory minimum wage, I applied the higher of the
minimum wage available under the FLSA or the NYLL, to the extent the statute of limitations
allowed.").

      c.    Spread of Hours

New York law provides that "[a]n employee shall receive one hour's pay at the basic
minimum hourly wage rate, in addition to the minimum wage required . . . for any day in which:
. . . the spread of hours exceeds 10 hours." 12 N.Y.C.R.R. § 142-2.4. Spread of hours is defined
as "the length of the interval between the beginning and end of an employee's workday," which
"includes working time plus time off for meals plus intervals off duty." Id. § 142-2.18. In other
words, "[t]he NYLL spread-of-hours claim, for which there is no counterpart under the FLSA,
provides that 'an employee is entitled to recover compensation for an extra hour of work at the
minimum wage each day that the employee works in excess of ten hours.'" Fermin, 93 F. Supp.
3d at 45 (quoting Man Wei Shiu, 2014 WL 652355, at *10). Any compensation awarded under
this provision is to be "in addition to any claim for minimum-wage payments or overtime." Yu
G. Ke, 595 F. Supp. 2d at 260.

Each plaintiff seeks each seek spread of hour wages, "calculated by multiplying the
number of days per week in which [the plaintiff's] spread of hours exceeded 10 hours and . . .
then [multiplying] that product . . . by the approximate number of weeks within [a] set interval."

Pls.' Proposed Findings of Fact and Conclusions of Law, Dkt. #54-1, ¶¶ 97, 102.[36]  Because I

have rejected defendants' documents and adopted plaintiffs' testimony regarding their hours, I

find that plaintiffs regularly worked shifts whose spread of hours exceed 10 hours each day.  But

plaintiffs fail to address whether employees may receive spread of hours pay if they make more

than the minimum wage.  The "district courts are split" on this question, but "the majority of

courts of this circuit that have considered this issue" find that "by its plain language, the spread

of hours statute applies only to employees making minimum wage."  Ellis v. Common Wealth

Worldwide Chauffeured Transp. of NY, LLC, No. 10-CV-1741, 2012 WL 1004848, at *6, 8

(E.D.N.Y. Mar. 23, 2012); see also D'Arpa, 2013 WL 3010810, at *22 (collecting cases).  But

see Doo Nam Yang v. ACBL Corp., 427 F. Supp. 2d 327, 339-40 (S.D.N.Y. 2005) (declining to

limit recovery under New York's spread of hours provision to only minimum wage employee).

"'Moreover, the New York State Department of Labor . . . has issued Opinion Letters

interpreting New York's spread of hours provision as applying only to employees earning

minimum wage.'"  Malena v. Victoria's Secret Direct, LLC, 886 F. Supp. 2d 349, 369 (S.D.N.Y.

2012) (quoting Li Ping Fu v. Pop Art Int'l Inc., No. 10-CV-8562, 2011 WL 4552436, at *6

(S.D.N.Y. Sept. 19, 2011) (citing N.Y.S. Dep't of Labor 3/16/07 Opinion Letter,[37] File No. RO-

07-0009).

 Elissaoui was the first plaintiff to begin working for defendants, in the summer of 2008.

Elissaoui Test. ¶ 6.  At that time, the minimum wage in New York was $7.15 per hour; from July

24, 2009 through December 30, 2013, it was $7.25 per hour; and from December 31, 2013

---

[36] Plaintiffs do not seek spread of hours damages for plaintiffs Vega or Garcia.

[37] In relevant part, the Department of Labor Opinion Letter states that on any day that an employee works a
spread of hours, the employee must be paid "the minimum wage for such hours together with an additional hour of
pay at the minimum wage.  If, however, the employee's regular wages for those hours worked is equal to or greater
than this 'spread of hours pay,' no additional wages need be paid."  Id. at 1.

through December 30, 2014, it was $8.00 per hour.  12 N.Y.C.R.R. § 142-2.1(a)(1)-(3).  I find

that defendants are liable for unpaid spread of hours pay as to Elissaoui and Ayala only to the

extent that those plaintiffs were not making more than the minimum wage during the time

periods at issue.

        d.     Deductions

      Plaintiffs also seek damages for deductions that defendants took from their wages,

allegedly in violation of § 193 of the NYLL.  See Pls.' Proposed Findings of Fact and

Conclusions of Law, Dkt. #54-1, ¶¶ 98 (seeking $400.00 in damages for plaintiff Ayala); 106

(seeking $600.00 in damages for plaintiff Vega); 110 (seeking $400.00 in damages for plaintiff

Garcia).  That provision provides, in pertinent part:

> No employer shall make any deduction from the wages of an
> employee, except deductions which . . . are expressly authorized in
> writing by the employee and are for the benefit of the employee . . . .
> Such authorized deductions shall be limited to payments for:
>
> (i) insurance premiums and prepaid legal plans;
>
> (ii) pension or health and welfare benefits; . . . and
>
> (xiv) similar payments for the benefit of the employee.

N.Y.L.L. § 193(1).

      The parties disputed this issue as one of fact.  As set forth above, I find that defendants

did in fact deduct wages from Ayala, Vega, and Garcia.  Accordingly, plaintiffs are entitled to

recover this loss.  See, e.g., D'Arpa, 2013 WL 3010810, at *23 (finding that deductions of wages

to cover the costs of damages to vehicles are "precisely the types of deductions that the New

York State Legislature contemplated when it enacted Section 193," because the legislature

provided that § 193 "'was intended to place the risk of loss for such things as damaged or spoiled

merchandise on the employer rather than the employee'") (quoting Hudacs v. Frito-Lay, 90 N.Y.2d 342, 325 (N.Y. 1997)).

     e.    Recordkeeping Violations

     Finally, plaintiffs seek damages concerning defendants' alleged failure to provide annual and weekly wage notices as required by NYLL §§ 195(1) and 195(3). Pls.' Proposed Findings of Fact and Conclusions of Law, Dkt. #54-1, ¶¶ 99-100 (seeking $5000.00 for each violation as to Ayala); 103-04 (same for Elissaoui); 107-08 (same for Vega); 111-12 (same for Garcia).

     Pursuant to § 195(1), an employer must "provide his or her employees, in writing . . . at the time of hiring, a notice containing [inter alia] the rate or rates of pay and basis thereof" and "the regular hourly rate and overtime rate of pay." NYLL § 195(1). This provision further requires that "[e]ach time the employer provides such notice to an employee, the employer shall obtain from the employee a signed and dated written acknowledgement, . . . of receipt of this notice, which the employer shall preserve and maintain for six years." Id. (emphasis added).

     Section 195(3) covers weekly notices. It provides that an employer must "furnish each employee with a statement with every payment of wages, listing [inter alia] the dates of work covered by that payment of wages; . . . rate or rates of pay and basis thereof . . . ; the regular hourly rate or rates of pay; the overtime rate or rates of pay; the number of regular hours worked, and the number of overtime hours worked." NYLL § 195(3); see also D'Arpa, 2013 WL 3010810, at *25 (finding defendants liable for compensating plaintiffs only in cash and never giving them wage statements).

     For the reasons already stated, I do not credit Boumoussa's testimony, nor do I find it appropriate to consider defendants' unreliable and inaccurate documentation. I thus find that

defendants violated these state wage notice and recordkeeping provisions for the entire duration of each plaintiff's employment with defendants.

## C.    Liquidated Damages

Plaintiffs seek liquidated damages "at an amount equivalent to any back wages due to any employee." Pls.' Proposed Findings of Fact and Conclusions of Law, Dkt. #54-1, ¶ 113; 29 U.S.C. § 216(b). They also seek liquidated damages "at an amount of 25% of the total unpaid wages prior to and including April 10, 2011 and 100% of the total unpaid wages thereafter unless Defendants can show that [they] had a good faith basis for believing that [they were] in compliance with the law." Id. ¶ 114 (citing NYLL § 663(1)).

The FLSA provides that an employer who violates the compensation provisions is liable for unpaid wages or overtime compensation "and an additional equal amount as liquidated damages." 29 U.S.C. § 216(c). "Liquidated damages are not a penalty exacted by the law, but rather compensation to the employee occasioned by the delay in receiving wages due caused by the employer's violation of the FLSA." Herman, 172 F.3d at 142. Nonetheless, a court may deny an award of liquidated damages if the employer can demonstrate that he "acted in subjective 'good faith' and had objectively 'reasonable grounds' for believing that the acts or omissions giving rise to the failure did not violate the FLSA."[38] Id. (citing 29 U.S.C. § 160). The employer bears the burden of making this showing, and it is a "difficult one to meet." Reich v. S. New Eng. Tele. Comms. Corp., 121 F.3d 58, 71 (2d Cir. 1997) (internal quotation marks and citation omitted). "Double damages are the norm, single damages the exception." Walton v. United Consumers Club, Inc., 786 F.2d 303, 310 (7th Cir. 1986). I find, as described above, that defendants

---

[38]    Again, the NYLL largely follows the language of the FLSA in providing that an employee is entitled to liquidated damages unless the employer demonstrates good faith. See Hernandez, 2016 WL 3248493, at *34 (citing 2009 N.Y. Sess. Law Ch. 372 (A. 6963) (McKinney's)).

in this case did not act in good faith. <u>See, e.g.</u>, <u>D'Arpa</u>, 2013 WL 3010810, at *25 ("As to objective reasonableness, as discussed above in connection with the willfulness inquiry in determining the appropriate statute of limitations under the FLSA, Defendants evinced a knowing and deliberate disregard for their legal obligations pursuant to the Act. Hence, they have not met their burden of avoiding the imposition of FLSA liquidated damages.").

Plaintiffs have requested liquidated damages under both the FLSA and NYLL. "Courts in the Second Circuit are divided over whether a plaintiff may recover liquidated damages under both FLSA and the NYLL." <u>Tackie v. Keff Enters. LLC</u>, No. 14-CV-2074, 2014 WL 4626229, at *5 (S.D.N.Y. Sept. 16, 2014). Prior to 2011, courts "routinely award[ed] cumulative liquidated damages under federal and state law because the differing remedies [under the NYLL and the FLSA] suggested distinct legislative goals." <u>Koszkos v. Janton Indus., Inc.</u>, No. 15-CV-1700, 2016 WL 4444329, at *6 (E.D.N.Y. Aug. 3, 2016). On April 9, 2011, the NYLL was amended from providing for liquidated damages in the amount of only 25 percent of unpaid wages to 100 percent of unpaid wages. Such an amendment "is generally recognized not to be retroactive, [and thus] any liquidated damages that a plaintiff may be entitled to after this date is calculated at 100% of the amount owed and any recovery before that date shall be calculated at the original 25% amount owed." <u>Apolinar v. Global Deli & Grocery, Inc.</u>, No. 12-CV-3446, 2013 WL 5408122, at *8 (E.D.N.Y. Sept. 25, 2013). But the amendment had a separate effect. "[N]ow that New York has amended its statute so that the comparable federal and state laws 'provide for essentially identical remedies with respect to liquidated damages, it is harder to argue that they are designed to compensate a plaintiff for disparate harms.'" <u>Koszkos</u>, 2016 WL 4444329, at *6 (quoting <u>Gunawan v. Sake Sushi Rest.</u>, 897 F. Supp. 2d 76, 91 n.11 (E.D.N.Y.

2012); see also Gortat v. Capala Bros., 949 F. Supp. 2d 374, 381 & n.3 (E.D.N.Y. 2013) (reject-ing request for cumulative awards of liquidated damages and finding that New York's "amend-ments have resolved the disagreement among the district courts" on the issue of overlapping remedies), aff'd, 568 F. App'x 78 (2d Cir. 2014)). I agree with this reasoning. Accordingly, for the period after April 9, 2011 (after which time both federal and state law provide for liquidated damages equal to the amount of unpaid wages), plaintiffs may be awarded such relief under only one statute. See Koszkos, 2016 WL 4444329, at *6.

**D.   Pre-Judgment Interest**

Plaintiffs, recognizing that a receipt of liquidated damages under the FLSA precludes their recovery of prejudgment interest under the same, seek an award of pre-judgment interest only on their claims asserted under New York law. Pls.' Proposed Findings of Fact and Conclu-sions of Law, Dkt. #54-1, at 116.

"It is well settled that in an action for violations of the [FLSA] prejudgment interest may not be awarded in addition to liquidated damages." Begum v. Ariba Discount, Inc., No. 12-CV-6620, 2015 WL 223780, at *3 (S.D.N.Y. Jan. 16, 2015) (citing Brock v. Superior Care, Inc., 840 F.2d 1054, 1064 (2d Cir. 1988)). "In contrast to the FLSA, the NYLL permits the award of both liquidated damages and pre-judgment interest." Fermin, 93 F. Supp. 3d at 48; see also Hernan-dez, 2016 WL 3248493, at *36 (citing NYLL § 198(1-a)). "Prejudgment interest is to be calcu-lated pursuant to the New York prejudgment interest rate of nine percent . . . per annum simple interest from a single reasonable intermediate date." Hernandez, 2016 WL 3248493, at *35 (cit-ing N.Y. C.P.L.R. §§ 5001(b); 5004). Prejudgment interest will thus be calculated from the me-dian date between each plaintiff's start and end date of employment with defendants.

**E.     Attorneys' Fees and Costs**

Finally, plaintiffs seek attorneys' fees and costs pursuant to the FLSA and NYLL.  Pls.'

Proposed Findings of Fact and Conclusions of Law, Dkt. #54-1, at 117 (citing 29 U.S.C.

§ 216(b); NYLL § 663).  I find that plaintiffs are entitled to recover reasonable attorneys' fees

and costs upon a proper showing of the same.

## CONCLUSION

As set forth above, I find that plaintiffs have proven, by a preponderance of the evidence,

that defendants violated the FLSA's and NYLL's overtime provisions and failed to provide wage

notices and statements as required under the NYLL.  I award plaintiffs compensatory and

liquidated damages, statutory damages, and prejudgment interest where applicable.

My conclusions of fact and law, at times, differ from those proposed by the parties.

Because my findings will necessitate different—and multiple—damages calculations with

respect to each plaintiff and cause of action, the parties should perform these calculations in the

first instance.  The parties are directed to file these calculations with Magistrate Judge Orenstein

on or before September 30, 2016.


SO ORDERED.

Dated: September 16, 2016
Brooklyn, New York                              s/Allyne R. Ross

                                                _____
                                                Allyne R. Ross
                                                United States District Judge